1 | Alan G. Dowling, Esq. (SBN 70686)
2 | ALAN G. DOWLING,
A PROFESSIONAL CORPORATION
3 | 6049 Pomegranate Lane
4 | Woodland Hills, California 91367
Telephone: (818) 679-6395
5 | Fax: (818) 436-2117
6 | Email: agdowling@aol.com
*Attorneys for Plaintiff* Ernest Lee Straughter
7

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10

| 11 | ERNEST LEE STRAUGHTER, | No. CV 08-2170 CAS (CWx) |
|---|---|---|
| 12 | Plaintiff, | Hon. Christina A. Snyder |
| 13 | vs. | Courtroom 5 |
| 14 | USHER RAYMOND IV, JERMAINE | **PLAINTIFF'S SUPPLEMENTAL** |
| 15 | DUPRI MAULDIN, BRYAN | **MEMORANDUM OF POINTS AND** |
| 16 | MICHAEL COX, EMI APRIL | **AUTHORITIES IN OPPOSITION TO** |
|  | MUSIC, INC., UR-IV MUSIC, INC., | **DEFENDANTS' MOTION FOR** |
| 17 | SO SO DEF PRODUCTIONS, INC., | **SUMMARY JUDGMENT, OR IN THE** |
| 18 | W.B.M. MUSIC CORP., BABYBOYS | **ALTERNATIVE, FOR PARTIAL** |
|  | LITTLE PUBLISHING COMPANY, | **SUMMARY JUDGMENT** |
| 19 | ARISTA RECORDS LLC, ZOMBA | Date Case Filed: April 1, 2008 |
| 20 | RECORDINGS LLC, SONY MUSIC | Trial Date: None Yet Set |
|  | ENTERTAINMENT and LaFACE | |
| 21 | RECORDS LLC, et al., | [MOTION UNDER SUBMISSION] |
| 22 | Defendants. | |

23

24

25

26

27

28

ALAN G.
DOWLING, A
PROFESSIONAL
CORPORATION
WOODLAND HILLS, CA

Straughter v Raymond, et al.,
USDC, CD CA, Case No. CV 08-2170 CAS(CWx)

0

PLTF SUPPLEMENTAL P&A IN OPP TO
DEFS MOT FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

Per the Court's instruction, this final Memorandum will only address in brief the content of the recently filed reports of George Saadi, Barry Downes and Lawrence Ferrara, and their impact on the pending defense motion for summary judgment. [1]

## I. SAADI AFFIRMS THAT *PLAINTIFF'S WORK* AND *BURN* SHARE SUBSTANTIAL, AND IN SOME RESPECTS STRIKING, SIMILARITIES.

George Saadi's curriculum vitae (attached to GS Rpt), and his testimony (GS Depo  ), describe his extensive formal musical education, including a master's degree, and years of training in music theory, piano performance and composition. Saadi has worked in the music recording industry for nearly 25 years, as a senior executive at Capitol-EMI, one of the "majors" in the music industry; in music publishing; as President and editor of several of the leading music industry trade publications; as owner of his own record and television productions companies; as a personal manager of recording artists; and as a songwriter himself. (GS Rpt ¶5-7).[2]

---

1 Due to the page limit, Plaintiff must refrain from discussing the particulars of the substantial musical similarities detailed by his musicology expert George Saadi, or of the music database searches conducted by Barry Downes. The Saadi report (Docket No. ["DN"} 270-1/271-1), is cited herein as "GS Rpt;" the Downes report (DN 272 Exh. A) is denoted "BD Rpt"). Cites to transcripts of the Saadi and Downes depositions (excerpts attached hereto as Exhibits A and B) are denoted "GS Depo" and "BD Depo." Cites to Lawrence Ferrara's response to Saadi and Downes (DN 273) are denoted "LF Resp." Finally, meaning no disrespect, the customary "Mr." and "Dr." are not used herein.

2 Although never before acting as a testifying expert witness, Saadi served for years as a consultant on musicology with the late Irwin Coster (GS Depo  146:13-148:13, 248:2-251:11), a leading forensic musicology expert witness. (GS Rpt ¶6). Saadi and Plaintiff's counsel Alan Dowling first became acquainted in 1992, when Dowling represented Saadi in a successful music copyright infringement litigation against Elton John (USDC, CD Cal, CV 92-5644 RG). Dowling also represented Saadi in an arbitration in the mid-1990s and several successful trademark infringement claims circa 2006-2008 (USDC, CD Cal, CV 06-0168 DSF, CV 06-2869 DSF, CV 06-2870 DSF and CV 07-3384 GPS). Saadi has also previously acted as a musicology and music

ALAN G. DOWLING, A PROFESSIONAL CORPORATION WOODLAND HILLS, CA

Straughter v Raymond, et al.,
USDC, CD CA, Case No. CV 08-2170 CAS(CWx)     1     PLTF **SUPPLEMENTAL** P&A IN OPP TO DEFS MOT FOR SUMMARY JUDGMENT

1   Comparing the Deposit Copy of *The Reasons Why* with the commercially released

2   album version of *No More Pain*, Saadi concludes that, except for certain isolated vocal

3   elements at the end, none of which involve or affect any of the similarities in issue her,

4   *No More Pain* is a derivative work based virtually in its entirety upon *The Reasons Why*,

5   and apparently even mixed from the sound recording that Plaintiff made with Reel

6   Tight in mid 1998. (GS ¶22-28). Ferrara apparently concurs. (LF Response ¶2). *The*

7   *Reasons Why* and *No More Pain* (in particular, all parts relevant hereto) are therefore

8   referred to herein as *Plaintiff's Work*.

9   Comparing *Plaintiff's Work* and *Burn*, Saadi finds:

10   --There are striking and substantial similarities in the 18-Bar introductions of

11   both songs.  Both contain a very unusual 18- bar introduction divided into two

12   segments of 10, then 8, bars, highly significant in the R&B genre.  In both songs,

13   strings enter at bar 3 (note the two-bar tacet of 8 beats); there are no drums for the

14   first 10 bars, or for 40 beats; drums and plucked arpeggiated guitars enter at bar 11;

15   and the lead vocal of each song begins at Verse 1 with a pick-up note near the end of

16   bar 18.  (GS Rpt ¶30-34).[3]

17   --There are substantial similarities in the overall structure and spatial

18   organization of both songs, which he describes in detail, and the initial statement of

19   the hook of each song occurring in the exact same measure, bar 35.  (GS Rpt ¶35-

20   36).[4]

21   _____

industry consultant to Dowling.

22   3 Ferrara has asserted (LF Resp ¶9) that the first 2 bars of *Burn* have no concrete

23   melody, and no definite pitch, but ignores the vocal line, which is loosely spoken over
a "percussive air synth sound" which clearly indicates that the song has begun.

24   Although melody is generally defined as "pitched sounds arranged in musical time . . ,"

25   there is an exception in that "rhythmic considerations may always [take] precedence
over melodic expression, as in parts of Africa where *percussive sounds of undetermined pitch*

26   are employed in lieu of semantic communication, or as pacemakers for systematic

27   forms of physical effort  ( . . . ritual dance) or both."  (*The New Grove Dictionary of Music and Musicians  p.* 363).

28   4  This hook, also sometimes referred to as the "hook chorus," is presaged in bars 8-

ALAN G.
DOWLING, A
PROFESSIONAL
CORPORATION
WOODLAND HILLS, CA

Straughter v Raymond, et al.,
USDC, CD CA, Case No. CV 08-2170 CAS(CWx)    2    **PLTF SUPPLEMENTAL P&A IN OPP TO
DEFS MOT FOR SUMMARY JUDGMENT**

1    --There are substantial similarities in repeated melodic (incl. pitch) sequences in
2    both songs. Any differences between them are insignificant, as explained by Saadi (GS
3    Rpt ¶37-43; GS Depo 95:7-14, 96:17-97:24, 99:8-20, 101:7-103:23), and can be
4    accounted for by text-setting choices, e.g., where some pitches are repeated in one
5    song while being held in another (this can be due to a variety of factors, such as to
6    accommodate lyrical needs). The fact that these sequences appear in the hooks and
7    choruses of *Plaintiff's Work* and *Burn*, as well as in conjunction with the title of the *Bur*
8    (in the lyric "I think that you should let it burn") underlines their importance to the
9    compositions, and the substantial similarity. (GS Rpt ¶ 37-43).

10    --There are substantial similarities in the harmonic progressions in both songs,
11    likewise discussed in detail by Saadi (GS Rpt ¶42-43). Both songs begin with a tonic
12    major chord, progressing to a minor 6 chord, then to a sub-dominant, major IV chord.
13    *Plaintiff's Work* advances to a dominant V chord in the next bar, while *Burn* repeats the
14    sub-dominant chord for this measure. When the same four bar progression is
15    repeated, however, the final bar of *Burn* goes to a dominant major V chord, while also
16    adding a minor 2 chord preceding the dominant in the same measure. (This ii-V chord
17    progression is a common vehicle used to create musical harmonic tension needing to
18    be resolved, usually by progressing to some form of tonic chord.) Harmonic
19    composition allows composers to substitute related chords serving the same function,
20    often for the sake of variety, e.g., the I, iii and vi chords or the ii and IV chords are of
21    the same "family", and are often used interchangeably. Though the appearance of a
22    chord progression using a substitute chord looks to be different, the impact on the
23    listener's ear may be more slight. (GS Rpt ¶42-43).

24    --There are substantial similarities in the stylistic uses and placement of melisma
25    prior to the fade out in both songs as part of the last chorus. The fact that the uses of
26    melisma in these two songs occur exactly where they do, signaling the chorus section

27
28    10 of the introduction in each song. At bars 39-42 in both, the melody hook chorus is
      substantially similar, with the vocal of *No More Pain* interpolated by synthesizer in *Burn*.

ALAN G.
DOWLING, A
PROFESSIONAL
CORPORATION
WOODLAND HILLS, CA

Straughter v Raymond, et al.,
USDC, CD CA, Case No. CV 08-2170 CAS(CWx)          3          PLTF **SUPPLEMENTAL** P&A IN OPP TO
                                                               DEFS MOT FOR SUMMARY JUDGMENT

1  preceding the fade, is highly unlikely, according to Saadi, to be mere coincidence. (GS
2  Rpt ¶44-45).

3      --Saadi also notes certain other similarities common to the two songs. For
4  example, at bars 111 through 114, *Plaintiff's Work* has modulated to the key of D-flat,
5  and *Burn*, at that locale, is likewise in the key of D-flat. The fade ending of both songs
6  consists of playing the substantially copied hook chorus. Finally, but not
7  insignificantly, both *Plaintiff's Work* and *Burn* exemplify the contemporary R&B sound,
8  making use of soul vocals with elements of hip hop production (i.e., synthesizers,
9  drum machines, samplers, etc.). It would be remiss to ignore these similarities, in
10  conjunction with considering the other substantial similarities in musical expression
11  described by Saadi. (GS Rpt ¶46-48).[5]

12      On the basis of his analysis and findings, Saadi concludes that *Plaintiff's Work*
13  and *Burn* share substantial, and sometimes striking, similarities in several identified
14  musical elements, song structure and spatial organization. If certain of the elements, in
15  isolation, have precedents in various genres, nevertheless, when taking into account
16  the combination of all of the substantially and strikingly similar elements identified,
17  Saadi is unaware of any prior song or songs embodying all such elements. He thus
18  opines that the co-existence in both works of these many substantially and/or
19  strikingly similar elements at once is sufficiently unique or complex that the songs
20  must be considered to be, to that extent, strikingly similar. On that basis, it is Saadi's
21  opinion that *Burn* was, in substantial and significant parts, aspects and elements, copied
22  from *No More Pain* (and therefore also from *The Reasons Why*).[6] (GS Rpt ¶3-4, 50-51).

23  _____
24  5 Defendants mischaracterize the similarities identified by Plaintiff's experts as being
25  similarities of idea, as opposed to expression. (E.g., LF Resp ¶3, 112-113). As Saadi
   makes clear, each element he has discussed focuses on a particular musical expression,
26  as reflected in the written scores, and as embodied in the sound recordings, of the
   songs, attached as exhibits to the experts' reports. They are not mere ideas in the
27  abstract, but the actual expression of the ideas in the particular musical context and
   content of each song.
28  6 In rhetoric unbecoming an expert witness, Ferrara repeatedly dismisses Saadi's work

**II. SAADI AND DOWNES ESTABLISH THAT THE COMBINATION OF SIMILARITIES SHARED BY *PLAINTIFF'S WORK* AND *BURN* IS UNIQUE, SUPPORTING A CONCLUSION THAT THE WORKS ARE STRIKINGLY SIMILAR.**

The combination of substantially similar elements described by Saadi as shared by *Plaintiff's Work* and *Burn* is apparently unique, and itself constitutes a "striking similarity" between the two works. It is well-established that the selection, arrangement or combination in an original way of otherwise unprotectable elements is subject to copyright protection. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1165, 1169 (9th Cir. 1977) (". . . a combination of many different elements of similarity may be sufficient to constitute infringement even if any one such element taken by itself would be trivial;"; "Lest we fall prey to defendants' invitation to dissect the works, however, we should remember that it is the combination of many different elements which may command copyright protection because of its particular subjective quality"); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485-86 (9th Cir. 2000)(songs shared a *combination of five unprotectable elements*, including title hook phrase, shifted cadence, instrumental figures, verse/chorus relationship and fade ending). See also *Apple Barrel Productions v. Beard*, 730 F.2d 384, 387-388 (9th Cir 1984); *Brown Bag Software v. Symantec*, 960 F.2d 1465, 1476, n. 4 (9th Cir 1992); *Jarvis v. A&M*, 827 F.Supp. 282 (D.N.J. 1993); *Tempo Music Inc. v. Famous Music Corp.*, 838 F.Supp. 162, 171-172 (S.D.N.Y. 1993); *Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990); *Bright Tunes Music Corp. v. Harrisongs Music Ltd.*, 420 F.Supp. 177 (S.D.N.Y. 1976).

Saadi (GS Rpt ¶ 49) and Downes (BD Rpt p. 6) have unequivocally testified

as merely a reiteration or mimicking of the excluded testimony of Dr. Keyes. (E.g., LF Resp ¶3, 10, 30, 41, 74). Saadi's report and testimony, however, make it clear that his analysis was independent, traditional, sound, and his conclusions his own. Indeed, although Saadi noted many of the same substantial similarities as Keyes had—which merely reaffirms that they are clear and present—he did not ultimately agree with all of her conclusions. (LF Resp ¶3).

1   that, based on their work, they cannot identify any other work, ever, that contained all
2   of the elements identified by Saadi as being substantially similar and appearing in both
3   *Plaintiff's Work* and *Burn*. Their testimony is reliable, and Defendants have come up
4   with no example to the contrary, much less proven that it establishes either lack of
5   originality in *Plaintiff's Work*.

6       Similarities are 'striking" where they cannot satisfactorily be accounted for as a
7   product of mere coincidence, independent creation, prior common source, or any
8   theory other than that of copying.." *Testa v. Janssen*, 492 F.Supp. 198, 203 (D.C.Pa.
9   1980); see also *Winn v. Opryland Music Group, Inc.*, 22 Fed. Appx. 728, 729 (9th Cir,
10  2001).[7]   Saadi has opined that the similar elements in these songs are so numerous,
11  and so similar also in their placement, purpose and use in the songs, that there is no
12  plausible possibility that their coexistence in both works is the result of either
13  coincidence or independent creation (GS Rpt ¶3-4, 49-51), an opinion corroborated by
14  the results of Downes' work (BD Rpt pp. 3-6). On that basis, Saadi has opined that
15  the combination of all these similarities evidences a *striking* similarity between these
16  two works (GS Rpt ¶49), suggestive of copying.

17  **III.   FERRARA FAILS TO DISESTABLISH THE ORIGINALITY OF**
18  **PLAINTIFF'S WORK, OR THE SUBSTANTIAL SIMILARITY**
19  **BETWEEN *PLAINTIFF'S WORK* AND *BURN*.**

20      Ferrara is unable to disestablish the existence or degree of the similarities
21  identified by Saadi. Consequently, he is relegated to attempting to minimize them with
22  mere conclusionary dismissals, or misdirecting attention away from the similarities and
23  toward all of the differences, no matter how trivial or immaterial, he can identify. This

24

25  7   The burden is on Defendants to prove independent creation. See *Three Boys, supra*,
    212 F.3d 477, citing *Granite Music Group v. United Artists Corp.*, 532 F.2d 718, 721 (9th
26  cir. 1976). Neither Defendants nor Dr. Ferrara prove that the combination of
    elements, or even the individual elements in question, were the product of either
27  coincidence or independent creation. The mere bald assertion of independent creation
28  does not constitute adequate proof of that fact.

ALAN G.
DOWLING, A
PROFESSIONAL
CORPORATION
WOODLAND HILLS, CA

1    ignores that the issue here is not the differences, but the similarities.

2    Defendants' references to, and attempted uses of, purported "prior art," and
3    Ferrara's misconceived references to "originality," reflect a fundamental
4    misunderstanding of those concept and their place in music copyright law. (E.g., LF
5    Resp ¶ 3-4). Further, citing no authority on point, Defendants erroneously attempt to
6    shift to Plaintiff burden of proof which does not fall upon Plaintiff in the first
7    instance.

8    The Copyright Act of 1976 requires only that Plaintiff's work be "original," *i.e.*,
9    independently created—but not necessarily novel—to qualify for legal protection. 17
10   U.S.C. § 102(a); *see Key Publications, Inc. v. Chinatown Today Pub. Enterprises, Inc.*, 945 F.2d
11   509, 513 (2d Cir. 1991). "[A] work will not be denied copyright protection simply
12   because it is substantially similar to a work previously produced by others, and hence,
13   is not novel. Accordingly, the search for prior art that frequently goes into challenging
14   a patent plays no role in copyright cases." *Nimmer on Copyright* § 2.01[A] (emphasis
15   added). *See also, Nimmer on Copyright § 2.05(D) and fn. 39.1; FASA Corp. v. Playmates*
16   *Toys, Inc.*, 912 F.Supp. 1124, 1147 (N.D. Ill. 1996), *vacated on other grounds*, 108 F.3d 140
17   (7th Cir. 1997); *Laureyssens v. Idea Group, Inc.*, 768 F.Supp. 1036 (S.D.N.Y.1991), *rev'd in*
18   *part*, 964 F.2d 131 (2d Cir. 1992); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d
19   1090, 1093 n.3 (2d Cir. 1977); see *Baron v. Leo Feist, Inc.*, 78 F.Supp. 686, 690 (SDNY
20   1948) aff'd 173 F.2d. 288 (2nd Cir.. 1949); *Wilkie v. Santly Bros*, 13 F.Supp. 136, 157
21   (SDNY 1935), aff'd 91 F.2d 978 (2nd Cir.), cert. denied 302 U.S.735 (1937); *Fred Fisher,*
22   *Inc. v. Dillingham*, 298 Fed. 145, 149 (SDNY 1924).

23   Ferrara resorts to the hackneyed tactic of trotting out a number of examples of
24   classical and popular works predating *Plaintiff's Work*, each containing one or more of
25   the several elements cited by Saadi, but none of which contain all such elements (or
26   even just the two similar pitch sequences plus an 18 bar introduction). This misleading
27   tactic of dissection combined with citation to isolated instances of similar past uses has
28   been expressly disapproved by the courts. See, e.g., *Nimmer on Copyright, supra*,

ALAN G. DOWLING, A PROFESSIONAL CORPORATION WOODLAND HILLS, CA

Straughter v Raymond, et al., USDC, CD CA, Case No. CV 08-2170 CAS(CWx)    7    PLTF **SUPPLEMENTAL** P&A IN OPP TO DEFS MOT FOR SUMMARY JUDGMENT

1 §2.01[A]. Certainly, Defendants offer no proof that either Plaintiff or Defendants
2 were copying any of the songs cited by Ferrara as "prior art"— the copyright
3 registrations of *The Reasons Why* and *Burn* both expressly state otherwise under oath—
4 either with respect to individual elements or relative to these two songs viewed as a
5 whole.

6     Ferrara also attempts to dismissively minimize and distort the results of plaintiff's
7 music research (prior art) expert Barry Downes. Downes' role in this case is simply to
8 search the largest extant database of musical works and see if any contained all of the
9 elements identified by Saadi, in combination. Ferrara tries to minimize the value and
10 significance of Downes' computer database, stating that it "contains but a fraction of
11 the universe of musical works that predate PAIN." (LF Resp ¶104)[8]    Downes'
12 computer database contains over 80,000 songs in all genres from rock, pop and R&B
13 to classical—over 1 ½ million pages of musical scores (BD Rpt pp. 2-3 and Exh. B;
14 LF Resp ¶104). There is nothing else like it in the world, in terms of its size, variety of
15 genres and works, thoroughness and reliablity.    Downes has used it in providing
16 music research services to the most prominent musicologists in many of best known
17 copyright infringement actions over the past two decades. (BD Rpt p. 2 and Exhs. A
18 and B). Both the Manatt Phelps law firm (counsel for Defendants herein) in many
19 cases, *and Ferrara himself*, have availed themselves of Downes' services previously.
20 (BD Depo ). While ITunes may contain millions of recorded works, only a small
21 fraction of those works have been widely heard; whereas the songs in Downes'
22 database are there because they received at least some threshold level of renown. (BD
23 Depo ).

24     Downes' search starts with a simple form of element—a given pitch sequence—
25 and he looks first for all songs in his database that share that (regardless of genre, date,
26 or the musical position or context within the work in which the pitch sequence

27 ──────────────
8 Ferrara does not, of course, reveal anything at all about his own prior art "database,"
28 resources or methodology, used in this case.

ALAN G.
DOWLING, A
PROFESSIONAL
CORPORATION
WOODLAND HILLS, CA

Straughter v Raymond, et al.,
USDC, CD CA, Case No. CV 08-2170 CAS(CWx)    8    **PLTF SUPPLEMENTAL P&A IN OPP TO
DEFS MOT FOR SUMMARY JUDGMENT**

1   appears,  e.g., whether the pitches appear within the same bar or bars, or oddly
2   straddle several). (BD Rpt Exh. B.)  That search results in a list of "hits"- songs in
3   which the sequence appears somewhere, used somehow. He is then able to search the
4   songs listed as "hits" using other criteria, to narrow the list down to those with a
5   greater degree of similarity and relevance.  (*Ibid.*)  Thereafter, he leaves it to a
6   musicologist to examine the actual scores of the works to see if, viewed in its entirety,
7   the musical passage can actually be said to be similar to that in the case at hand (and
8   prior to the work in issue). (*Id.*; BD Depo ).

9       In this case,  Downes initially did five searches using two pitch sequences from
10  *Plaintiff's Work* and three from *Burn*—the first two pitch sequence "elements"
11  identified by Saadi. (BD Rpt pp. 3-6.) Some of the searches turned up no "hits," and
12  others turned up a substantial number.  But most significantly, no one song in the
13  entire database contained both the first AND second pitch sequences identified by
14  Saadi, either as they appeared in *Plaintiff's Work*, or in *Burn*, or in any combination of
15  both. (BD Rpt p. 6).  Only one song in the database- "The Greatest Love of All"—
16  appeared in the results for two different searches, and it contained the first pitch
17  sequence as it appears in *Plaintiff's Work* AND the first sequence as it appears (slightly
18  varied) in *Burn*; however, that song did not contain both the first AND second pitch
19  sequences, no did it have an 18 bar introduction or several of the other elements
20  identified by Saadi. (BD Rpt pp. 5-6 ¶¶ F-G.)

21      Ferrara misunderstands and mischaracterizes Downes' results, by erroneously
22  inferring that mere pitch sequence "hits" within Downes' initial search identify songs
23  that are necessarily "the same or similar" works. (LF Resp ¶4.) They may indeed be
24  entirely different, or even post-date the works in issue here. (BD Depo ). He also
25  ignores entirely the utter *absence* of results indicating any works containing the *entire
26  combination* of elements identified by  Saadi, *or even just the first two pitch sequences plus an 18
27  bar introduction.*  (BD Rpt p. 6.)

28      Characteristically, Ferrara repeatedly resorts to hyperbole, overstatement and

ALAN G.
DOWLING, A
PROFESSIONAL
CORPORATION
WOODLAND HILLS, CA

Straughter v Raymond, et al.,                                    9          **PLTF SUPPLEMENTAL P&A IN OPP TO
USDC, CD CA, Case No. CV 08-2170 CAS(CWx)                         DEFS MOT FOR SUMMARY JUDGMENT**

1  conclusionary language in lieu of proof—for example, suggesting that the presence of
2  ten examples, in all genres, between 1914-1992, of musical works which he asserts to
3  contain a given element, makes the element "commonplace" or "widely used"  (LF
4  Resp ¶¶5-6, 68, 75, 80, 115).

5     Ferrara likewise mischaracterizes the pitch sequences of *Plaintiff's Work* and *Burn* as
6  "very different." As established by Saadi (GS Rpt ¶37-40), these two pitch sequences
7  are, in fact, substantially similar. The mere existence of additional notes within, e.g., a
8  2 bar passage, and therefore the additional pitches they indicate, does not mean that
9  the two passages are not, and do not sound, practically identical.  The different
10 appearance of the pitch sequences, in print in a report, may only be the result, for
11 example, of substitution of 2 16th notes for a single 8th note, while the accented or
12 emphasized notes in the passages may be identical in pitch and placement.

13                              **CONCLUSION**

14    It is axiomatic that the Court's function in adjudicating this motion is issue-
15 finding, not issue-resolution. The evidence of the non-movant is to be believed, and
16 all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.,* 477
17 U.S. 242, 249–255 (19860; see also *Eastman Kodak Co. v. Image Technical Services, Inc.*
18 (1992) 504 U.S. 451, 112 S.Ct. 2072; *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors*
19 *Ass'n* (9th Cir. 1987) 809 F2d 626, 630–631. These unquestionably qualified experts'
20 opinions are each founded in their earnest analysis of the same data and material; their
21 differences are not for the Court to resolve at this time. For the foregoing reasons,
22 Plaintiff respectfully requests that the Court deny in its entirety Defendants' motion
23 for summary judgment, or in the alternative, for summary adjudication of issues.

24 Dated:   July 29, 2011          **ALAN G. DOWLING,**
                                 **A PROFESSIONAL CORPORATION**
25
26                              By: *Alan G. Dowling*
27                                 Alan G. Dowling
                                 *Attorneys for Plaintiff* Ernest Lee Straughter
28

ALAN G.
DOWLING, A
PROFESSIONAL
CORPORATION
WOODLAND HILLS, CA

Straughter v Raymond, et al.,          10      **PLTF SUPPLEMENTAL P&A IN OPP TO**
USDC, CD CA, Case No. CV 08-2170 CAS(CWx)      **DEFS MOT FOR SUMMARY JUDGMENT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

## Excerpts from

## Transcript of the Deposition of

# George S. Saadi

# (7/8/2011)

ALAN G.
DOWLING, A
PROFESSIONAL
CORPORATION
WOODLAND HILLS, CA

Straughter v Raymond, et al.,
USDC, CD CA, Case No. CV 08-2170 CAS(CWx)

11

**PLTF SUPPLEMENTAL P&A IN OPP TO
DEFS MOT FOR SUMMARY JUDGMENT**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


ERNEST LEE STRAUGHTER, an )

individual,                )    ORIGINAL
                           )
           Plaintiff,      )
                           )
      vs.                  )    No. CV-08-2170 CAS (CWx)
                           )
USHER RAYMOND, IV, et al.,)
                           )
           Defendants.     )
_____)


DEPOSITION OF GEORGE S. SAADI

Los Angeles, California

Friday, July 8, 2011


Reported by:

LAURIE HELD-BIEHL

CA CSR No. 6781

TX CSR No. 8555

JOB No. 303815

George S. Saadi                                    7/8/2011

```
        1   now, I'm correct, am I not, that the -- it appears
        2   and it's sung in -- in "No More Pain" in one of the
        3   harmonizing voices, correct?
        4        A    That's correct.
12:41   5        Q    And it's played on an instrument in "Burn"?
        6        A    Yes.
        7        Q    I'm correct, aren't I, that the sequence in
        8   "No More Pain," 1-7-1-1-1-2-3-2-1-6-5 is different
        9   than the sequence in "Burn," 1-7-1-7-1-2-3-2-1?
12:42  10        A    Would you repeat your question?
       11        Q    I'm correct, aren't I, that the sequence in
       12   "No More Pain" of 1-7-1-1-1-2-3-2-1-6-5 is different
       13   than the sequence in "Burn," 1-7-1-7-1-2-3-2-1?
       14        A    I would say they're similar.
12:43  15        Q    They're similar but they're also different,
       16   right?
       17        A    There's -- there are differences in them, in
       18   notes that are repeated.
       19        Q    And there's differences in notes that are
12:43  20   repeated, there's differences in their length, right?
       21        A    I believe -- well, yes.
       22        Q    And the -- the only --
       23             The match-ups, if you will, are on the
       24   1-7-1, right, and then on the 1-2-3-2-1, right?
12:44  25        A    It's difficult to ascertain that just
```

95

```
 1    looking at that -- that slice of what you're asking
 2    me.
 3                "Burn," there's an 8-note measure and -- I
 4    mean 9-note and you -- I mean not measure, an 8-note
12:44  5    sequence, and you've just told me that
 6    1-7-1-1-2-3-2-1 are the same; so that's 8 of the
 7    9 notes are the same, correct?
 8        Q    Well, it's actually --
 9        A    If I understand what you're asking me.
12:45 10        Q    I'm saying -- I'm saying that those are the
11    ones that are the same.
12             MR. ANDERSON:  Notes or pitches?
13             MR. JACOBS:  Pitches, rather.
14             THE WITNESS:  That's correct.
12:45 15    BY MR. JACOBS:
16        Q    Okay.  But the -- the 7 --
17                There's a 7 in "No More Pain," it says
18    1-7-1-7, whereas in "No More Pain" (sic) it's
19    1-7-1-1, right?
12:45 20        A    That is correct.
21        Q    Okay.  And that affects the perception of
22    this part of the song where this appears, right?
23        A    It -- it -- it --
24                Out of context like that, it's hard to
12:45 25    answer that.
```

96

```
         1        Q    Well, a 7 is different than a 1, right?

         2        A    It is, yes.

         3        Q    Okay.

         4        A    It's a half step away in scale.

12:45    5        Q    Right.

         6        A    It actually couldn!t get any closer but it's

         7   a half step away.

         8        Q    Right.

         9             You didn't find the "No More Pain" sequence

12:46   10   in "Burn," did you?

        11        A    The "No More Pain" sequence in "Burn"?

        12        Q    Let me ask you the other way.

        13             You didn't find the sequence

        14   1-7-1-1-1-2-3-2-1-6-5 in "Burn," did you?

12:46   15        A    I found a similar sequence in "Burn."

        16        Q    But not the same one?

        17        A    I'm not sure what you're asking me.

        18        Q    Well, the "Burn" sequence 1-7-1-7-1-2-3-2-1

        19   is different, right?

12:46   20        A    It's similar.

        21        Q    Right.

        22             But it's not the same?

        23        A    It's -- I can't tell you that it's

        24   different.  I consider it similar.

12:46   25        Q    Well, it's sort of like the question "Are
```

George S. Saadi                                           7/8/2011

```
         1    question.  That's what I understood your original
         2    question to be.
         3         MR. JACOBS:  Actually, I'll go back and I'll
         4    repeat --
12:47    5         MR. DOWLING:  Yes, please.
         6         MR. JACOBS:  -- the question that I want the
         7    answer to.
         8    Q    The sequence in "Burn," 1-7-1-7-1-2-3-2-1 is
         9    different than the sequence in "No More Pain"
12:47   10    1-7-1-1-1-2-3-2-1-6-5, right?
        11    A    I have to look at the text setting and how
        12    that is used in the song.  And I found those two
        13    similar; so I don't feel comfortable telling you that
        14    they're not.
12:48   15    Q    Well, I'm not asking you whether they're
        16    similar.  I'm asking you whether they're different.
        17    And you haven't answered that question.
        18    A    And musically they're the same.
        19    Q    Musically they're the same?
12:48   20    A    Yes.
        21    Q    Okay.  So they're the same even though, as
        22    you pointed out already, that the 7 is a half a step
        23    away from the 1, doesn't line up, and even though, as
        24    you've already agreed, that there's 9 pitches in
12:48   25    "Burn" to 11 in "No More Pain," and that "Burn" does
```

99

George S. Saadi                                    7/8/2011

1    "Burn"?

2         A    I see more than three.

3         Q    How many do you see?

4         A    Are you referring to the pitch sequences or

12:51  5    the excerpted melody?

6         Q    I'm referring to the pitch sequences.

7         A    I see 8 of the 9 in "Burn" being similar to

8    what's in "No More Pain."

9         Q    So you're saying -- you're saying that they

12:51 10   have --

11              Well, I'm asking you very specifically about

12    whether they have the same rhythm corresponding --

13    the same pitch sequence corresponding pitches have

14    the same rhythm.

12:51 15             Do you follow me?

16         A    You can't judge that by the way the pitch

17    sequences are presented.

18         Q    Why not?

19         A    Because they -- the time values may not

12:51 20   be -- each note might not equate to a matching

21    identical time value in the other note.

22         Q    The --

23              I'm correct, am I not, that out of the

24    11 pitches in "Pain" and the 9 pitches in "Burn,"

12:52 25   only 5 corresponding pitches have the same rhythmic

101

George S. Saadi                                            7/8/2011

```
       1    duration?
       2         A    I would have to analyze that to answer that.
       3         Q    So you haven't analyzed that?
       4         A    I presented in my report what I found was
12:53  5    the most relevant similarities.
       6         Q    All right.  And that's just the pitch
       7    sequence comparison?
       8         A    Yes.
       9         Q    Okay.  Am I correct that Sequence Number 1
12:54 10    in "Burn" has three ornamental notes that are not
      11    found in Sequence Number 1 in "No More Pain"?
      12         A    That's correct.  Grace notes.
      13         Q    Sequence Number 1 in "No More Pain" has
      14    2 sixteenth notes, correct?
12:55 15         A    Oh, yes.  Yes.  Correct.
      16         Q    And in contrast, "Burn" doesn't have any
      17    sixteenth notes, correct?
      18         A    That is correct.
      19         Q    And am I also correct that Sequence Number 1
12:55 20    in "Burn" has a long dotted half note tied to a
      21    quarter note?
      22         A    Yes, you're correct.
      23         Q    And that's 4 times longer in duration
      24    than any of the 11 notes in this sequence in "No More
12:55 25    Pain," right?
```

102

George S. Saadi                                        7/8/2011



```
 1        A    You're talking -- you're dealing with a -- a

 2   melody that has lyrics to it that have to -- that has

 3   to accommodate the lyrics versus an instrumental

 4   section; so it -- it -- the sixteenth note question,

 5   this question, might -- that might be the case, but

 6   it doesn't -- it's not as important as what might be

 7   in common.

 8        Q    And in your view what's that -- what's

 9   important?

10        A    Grace notes are embellishments.  They're not

11   essential to the melody or the harmony.  That comes

12   right out of your -- if that's the Harvard book, if I

13   recognize it, they're not essential to the melody, so

14   they're -- they're -- they're embellishments.

15             In fact, if you look at that measure you've

16   added 3 notes in the synthesizer line of "Burn" but

17   that measure gets no more time; so how do you add

18   notes to a measure and not make the measure longer?

19             It's an insignificant addition because you

20   have to subtract the note from the neighboring

21   note -- the value of that from the neighboring note

22   so that the measure doesn't go over.  It's really

23   just a decoration.

24        Q    So what bearing does what you just said have

25   on my question to you about the long dotted half note
```

12:56  5
12:56 10
12:56 15
12:57 20
12:57 25

103

George S. Saadi                                      7/8/2011

```
        1   still see that contour in that -- that portion of it.
        2        Q   But you have to read out the ends to get
        3   there, right?
        4        A   I'm sorry?
03:11   5        Q   You have to omit the end to keep your
        6   contour, right?
        7        A   Yeah.  Well, I wasn't -- I wasn't -- I -- I
        8   don't find -- I don't find them exactly the same.
        9   But I find them similar enough that I -- I see -- I
03:11  10   think they're substantially similar.
       11        Q   When did you first hear the term
       12   "text-setting choice"?
       13        A   I think Irwin Coster may have used that term
       14   with me.  But I couldn't tell you when the first time
03:11  15   I heard it was.
       16        Q   When did you work for Irwin Coster?
       17        A   From 1989 until he passed away.
       18        Q   When did he pass away?
       19        A   I actually can't remember.  But it's been
03:11  20   years.
       21        Q   1990?
       22        A   No, no, no.  In the 2- -- I don't know,
       23   2000 -- probably in the last -- I don't know, I would
       24   say the late 19- -- the -- I can't remember.  It's
03:12  25   been years since he died but he certainly lived in
```

George S. Saadi                                                 7/8/2011

1    the mid to late '90s if not beyond then.

2         Q    I'm sorry.

3              So you worked with him -- you worked with

4    him from 1989 until he passed away?

03:12   5         A    Yes.

6         Q    And what were you doing for him?

7         A    I met Irwin because he handled a copyright

8    case that I was involved in and I was fascinated with

9    what he did.  And he needed help; so anything that I

03:12  10   got experience in, I did.

11              It started simply entering -- getting music

12   and entering it into his database.  He would reduce

13   the notes to pitch sequences and then you would enter

14   them into the system that he used to search prior

03:13  15   art.

16         Q    Uh-huh.

17         A    So I did that for many years.

18              I actually -- he taught me how he varies his

19   searches in order to look for things that might not

03:13  20   be exactly the same but close enough that he -- he

21   can consider them.

22              He taught me what -- he looked at a printed

23   manuscript as opposed to listening and then the role

24   in listening to things.

03:13  25              We worked on many commercials, many other

147

George S. Saadi                                            7/8/2011

```
         1    copyright cases.
         2             He needed help with things.  That was his --
         3    I don't want to call myself an assistant, it started
         4    that way, but I got to be --
03:14    5             I actually think he wanted to continue
         6    his -- you know, he saw the future in working on this
         7    with me.  But he passed away unexpectedly and we
         8    never really did anything with this tremendous
         9    library that he had.
03:14   10        Q    And were you full time --
        11        A    No.
        12        Q    -- employed by him?
        13        A    No.
        14        Q    So Irwin Coster told you about this term
03:14   15    "text-setting choice"?
        16        A    I -- I can't be sure but I -- it may have
        17    come up with Irwin.  But I can't remember where I
        18    first heard it.
        19        Q    Have you ever read it in a book?
03:14   20        A    Yes.
        21        Q    Do you remember the name of the book?
        22        A    Huh.  I don't know.  I've -- I've read
        23    Groves Online.  I've read the Harvard.  I've read --
        24    I can't remember -- I can't remember where I saw it.
03:14   25    I don't separate it.
```

148

George S. Saadi                               7/8/2011

```
 1        Q    At this point I've lost it.
 2             As part of your experience in the music
 3   industry did you ever do musicological analysis for
 4   any of the companies that you were working for to
06:46 5   determine whether two compositions were substantially
 6   or strikingly similar?
 7        A    I did that with Irwin Coster, but not as an
 8   employee of the companies I worked for.
 9        Q    And for Irwin Coster you were inputting
06:46 10  pitch sequences into a database, correct?
 11       A    Well, that was one of the things.  But --
 12       Q    What else did you do for Irwin?
 13       A    We looked at -- there were cases where --
 14            I don't know if any of it's confidential.
06:47 15  Can I just offer what I know?  I don't know what his
 16  deal was.
 17       MR. DOWLING:  With all due respect, Irwin is
 18  dead; what's he going to do about it?
 19       THE WITNESS:  Okay.
06:47 20       MR. DOWLING:  Just don't name client names
 21  unless it's a case that's in the public record.
 22       THE WITNESS:  Well, if it's over does that mean
 23  it's in the public record?
 24       MR. DOWLING:  Well, you can use your discretion.
06:47 25  Just don't disclose anything super confidential that
```

248

George S. Saadi                                               7/8/2011

```
 1   would bother those clients.  But if it's the
 2   description of the work that you did, you could -- or
 3   in a particular case, you could name that case.
 4       THE WITNESS:  There was a big music artist that
06:47  5   was getting divorced and he had recorded a record
 6   while he was married.  And my understanding is he
 7   wanted to act like he recorded it after they split up
 8   so that his wife had no claim on it; so he made
 9   slight changes and put a record out.
06:47 10       So she hired Irwin and I to say is this
11   record the same as the demos that I dug out of my
12   closet.  And we looked at both of them and analyzed
13   them to help her to represent what her interests
14   were.  That's one example.
15   BY MR. ANDERSON:
16       Q   How long ago was that?
17       A   Probably in the '90s.
18       Q   When was the last time that you did a
19   musicological analysis prior to this -- this -- well,
06:48 20   last month?
21       MR. DOWLING:  Vague and ambiguous.
22       You can answer.
23       THE WITNESS:  There have been occasions after
24   that that there were many times commercials would
06:48 25   want to license the audio of a track and then decide
```

249

George S. Saadi                                          7/8/2011

```
       1    against paying the license fee for a song.  And then
       2    trying to cre- -- create something that was, they
       3    thought, different enough to imply that song but not
       4    get in trouble.
06:49  5    BY MR. ANDERSON:
       6        Q.  A vibe-a-like?
       7        A   I'm sorry?
       8        Q   A vibe-a-like?
       9        A   I don't know.  I don't know what that means,
06:49 10    a viba (sic) --
      11        Q   That's all right.  Go ahead.
      12        A   But a lot of the other work I did with Irwin
      13    was whether or not that commercial -- you know, some
      14    of them, if you don't mind my saying, were stupid
06:49 15    enough to go ask for the song and then to copy it
      16    after they decided not to use it.
      17            So there -- there were -- you know, I don't
      18    want to give you particular examples but stuff like
      19    that seemed to happen and they called Irwin and I
06:49 20    often used to do that.  But I can't remember
      21    specifically the last time I did this.  It's not --
      22    it's not something that the occasion has come up
      23    frequently.
      24        Q   You said someone called you regularly to do
06:49 25    that.  Who was calling you --
```

George S. Saadi                                    7/8/2011

```
       1          A    Irwin would call me.
       2          Q    Okay.  What was Irwin's background that --
       3     and I apologize for not knowing the gentleman, but
       4     what was his background that allowed him to provide
06:50  5     musicological analyses?
       6          A    What I recall from him is that he worked in
       7     the music library at Paramount or Twentieth Century
       8     Fox or something, and he was a musician and he was a
       9     composer and he found an interest in and had a -- and
06:50 10     got a reputation and had people that called him
      11     regularly.
      12          Q    In doing your analysis for this case what --
      13               You've referred to the phrase "substantially
      14     similar."  What does that mean?
06:50 15          A    "Substantially similar" to me means that the
      16     similarities between two works are -- have some
      17     substance, they're not trivial.
      18          Q    Did you make any attempt to distinguish
      19     between the substantial similarity of ideas versus
06:51 20     the substantial similarity in expression of ideas?
      21          A    I'm not an attorney.  My belief or my
      22     understanding is if it's recorded or if it's
      23     documented on paper, it's -- it's expressed; so
      24     you're -- it's an expression of an idea.  And I know
06:51 25     music is a different art than the other arts.  But I
```

251

George S. Saadi                                        7/8/2011

1   STATE OF *California*                )

2                                        )   ss.

3   COUNTY OF *Los Angeles*             )

4

5

6

7

8

9

10          I, the undersigned, say that I have read the

11   foregoing deposition, and I declare, under penalty of

12   perjury under the laws of the State of California,

13   that the foregoing is a true and correct transcript

14   of my testimony contained therein, incorporating any

15   and all changes and/or corrections as noted by me.

16          EXECUTED this ___*15*___ day of ___*July*___,

17   2011, at ___*West Hills, California*___.

18

19

20                _____

21                GEORGE S. SAADI

22

23

24

25

1

# Exhibit B

2

3

4

5

## Excerpts from

6

7

## Transcript of the Deposition of

8

9

## Barry E. Downes

10

11

## (7/15/2011)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALAN G.
DOWLING, A
PROFESSIONAL
CORPORATION
WOODLAND HILLS, CA

Straughter v Raymond, et al.,
USDC, CD CA, Case No. CV 08-2170 CAS(CWx)

12

**PLTF SUPPLEMENTAL P&A IN OPP TO
DEFS MOT FOR SUMMARY JUDGMENT**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ERNEST LEE STRAUGHTER, an )
individual,                )
                           )
            Plaintiff,     )
                           )
     vs.                   )   No. CV-08-2170 CAS (CWx)
                           )
USHER RAYMOND, IV, et al.,)
                           )
            Defendants.    )
_____)

DEPOSITION OF BARRY E. DOWNES

New York, New York

Friday, July 15, 2011

ORIGINAL

Reported by:
LISA LYNCH
CCR, RMR, CRR, CLR
NJ CCR No. XI00825
JOB No. 303833

Barry E. Downes                                          7/7/2011

15

1    translate Mr. Ricigliano's piano playing was what?

2        A    That's an interesting question.  I don't

3    think I really remember it now.

4             It was an early type of MIDI program but I

5    don't remember the name of it.  It was done on a --

6    it was done in a program called HyperCard, which was

7    very popular in the early days of Apple, and at that

8    time -- and it was programmed in that whole language

9    which disappeared later.  We didn't use it any

10   longer, but it was very helpful then and it could

11   handle music into notes.

12            So to whatever degree, it would have been

13   one of the various -- and I had a lot of different

14   programs I was playing with at the -- you know, it

15   isn't a neat path.  You sort of try something here

16   and then you try something else.

17       Q    I understand.

18       A    But it was in that area.

19       Q    And this database, the MRC database that you

20   used, from what period of time until what period of

21   time?

22       A    19 -- we used a little bit in 1989, I think,

23   when we formed the partnership.  But then it went

24   through most of 1990's.

25            In numerous cases for your firm and others,

Barry E. Downes                                    7/7/2011

16

```
 1    and certainly for Sony, it had a lot of -- lot of
 2    different cases that were taking place with that
 3    earlier database.
 4         Q    When you say "my firm," what firm are you
 5    referring to?
 6         A    I'm talking about Music Research
 7    Consultants.
 8         Q    Okay.  You said --
 9         A    Oh, no.  I stated -- in terms of firms, I'm
10    saying Manatt Phelps, for instance.
11         Q    You're saying "Manatt" --
12         A    Put a lot of food on the table over the
13    years.  And Sony we did a number of different cases
14    for --
15         Q    I see.
16         A    -- during those years.
17         Q    On your --
18              I'm going to mark right now as Defendants'
19    Exhibit 519 your report in this case.
20              (Defendants' Exhibit 519 was
21         marked for identification and is
22         attached hereto.)
23    BY MR. JACOBS:
24         Q    Mr. Downes, if you could just take a brief
25    moment and verify that Defendants' Exhibit 519 is in
```

Case 2:08-cv-02170-CAS -CW  Document 280   Filed 07/29/11   Page 33 of 44   Page ID #:4875

```
 1        Q    Most of the cases you've worked on, sir,
 2   have involved pop music, correct?
 3        A    Right.
 4        Q    Why do you have so many classical composers'
 5   works in your database?
 6        A    One reason is because we did not want to
 7   lock the database into just one genre of music.  It's
 8   often quite helpful to say, hey, this melodic idea or
 9   this pattern of pitches that you have in this song
10   actually goes back to Beethoven and Bach and a number
11   of people.
12        Q    And why is that helpful?
13        A    Well, it's helpful simply because it says
14   that ideas can originate  in many different places.
15   It isn't really necessarily clearly prior art that
16   you might call it that, but I don't usually use that
17   term.  I --
18        Q    Why don't you use that term?
19        A    Why don't I?
20        Q    Yeah.
21        A    Because when I'm doing a search, the first
22   thing I'm doing is looking for anything that may
23   respond to the criteria that you've put into it.  And
24   often it may be very helpful -- let me give you one
25   example.
```

1        MR. DOWLING:  Just --

2        THE WITNESS:  Okay, whatever.

3        MR. DOWLING:  Just try to answer the questions.

4        THE WITNESS:  Forgive me.  I've been told to be

5   brief and I -- sometimes I'm not brief.

6   BY MR. JACOBS:

7        Q    You can go ahead and please tell me your

8   example.

9        A    Just if you suddenly find five Beatles

10  songs, even if they were after the date or weren't

11  prior art but they might be the influential factor

12  for the musicologist, I wouldn't know.  One thing I

13  don't do is make any of those decisions.

14       Q    Who --

15       A    I give the facts --

16       Q    When you say "those decisions," what do you

17  mean by "those decisions"?

18       A    Whether this is going to be important or

19  that is going to be important.  I -- I supply the

20  information.

21       Q    You just supply data; is that correct?

22       A    That's correct.  Otherwise -- forgive me,

23  musicologists could get very grumpy with me if I

24  start making musicologically, you know, analysis of

25  what's going on.  That's why they're paid.

Barry E. Downes                                      7/7/2011

40

1      Q    What percentage of generally available music

2    do you think the 80,000 songs in your database

3    represents?

4      A    Certainly not all of it or close to it.  But

5    the selection of song and what has been transferred

6    into a MIDI environment, meaning with full

7    arrangements and so on, automatically signifies that

8    music is probably more important than a lot of other

9    things that sort of are there out on the -- in the

10   marketplace for a few days and go away, that

11   they're -- there's more effort put into it.

12     Q    You mean that because somebody decided to

13   put a song into MIDI form, that indicates that it's

14   important?

15     A    It often suggests that.  It's a lot of work

16   to do a MIDI file.  MIDI files can vary greatly.

17          If I may just take one moment, a MIDI file

18   can be what would be called close to just a standard

19   sheet that you'd get of a piece of music, a melody

20   line and a piano arrangement.  The one thing that

21   distinguishes this database in many respects is that

22   it may involve 10 or 20 times the amount of musical

23   information that you have in an individual lead

24   sheet.  We have a -- piccolos will have all kind of

25   instrumentation and that instrumentation may also be

Barry E. Downes                                    7/7/2011

41

```
 1    helpful to the musicologist because it will say in
 2    this line we're seeing this melodic, you know,
 3    whatever, these pitch patterns, or whatever it is, so
 4    it's --
 5         Q    You're a member of BMI, right?
 6         A    That is correct.
 7         Q    And BMI has well in excess of four million
 8    songs registered with it, right?
 9         A    Right.
10         Q    And iTunes has, I don't know, in excess of
11    approximately 13 million songs; is that about right?
12         A    Whatever.
13         Q    Does that sound about right to you?
14         A    It doesn't -- it's not of importance to me.
15         Q    Why is it of no importance to you?
16         A    Because what I -- what this database is
17    doing is looking at a vastly larger quantity of music
18    than anything -- than anything else in the world is
19    looking at.  You just can't find anything that comes
20    close to it.  Thus, this range of music covering
21    classical and folk, not disciplining itself to say
22    all we want to do is -- is very valuable from what
23    I'm trying to do, which is just to look at what is
24    out there, what occurrences are out there.
25              If I had just focused it on, you know, just
```

Barry E. Downes                                           7/7/2011

42

1    rock music, that would really not open it up to other

2    investigation.

3         Q    Well, let me ask you this --

4         A    Forgive my long-winded --

5         Q    No.  Let me ask you this question:  How is

6    it that you can say that 80,000 songs represents more

7    information than 13 million songs on iTunes?

8         A    I don't remember that.  But you can't find

9    any information on the 13 million songs on iTunes.

10   You can find a title and then you can go look but you

11   can't do any searches in it.

12        Q    So the distinction you're drawing is that

13   your database is searchable whereas iTunes is not?

14        A    You betcha.

15        Q    But in terms of the number of songs that the

16   80,000 in your database represents relative to what

17   is generally available, it is really a drop in the

18   bucket, isn't it?

19        A    No.

20        Q    Why do you say that?

21        A    Because what is available at any given time,

22   if you're talking about a music; for instance, if

23   you're talking about the Beatles, it's a very

24   important significant area of music.  Other music is

25   not as important; it doesn't mean it shouldn't be in

Barry E. Downes                                    7/7/2011

43

1      there, and I'd like to have it 10 times the size it

2      is.

3              But what we have in terms of music pages

4      which you're talk -- let's say a music example here

5      equals about a million and a half pages of music that

6      we can go through in a very quick period of time on a

7      first preliminary look.  There's nothing --

8          Q    But when you're going through -- when you're

9      going through those millions of pages, essentially

10     the first pass that you make is you're looking at

11     pitch sequences, correct?

12         A    It always starts with pitch sequences --

13         Q    Correct.

14         A    -- as a first point.

15         Q    So it's different --

16             That is a different analysis than picking up

17     the sheet music to a song and looking at both pitch

18     sequence and rhythmic duration and harmony and

19     harmonic rhythm and key and all these other things,

20     right?

21         A    Absolutely.

22         Q    Okay.

23         A    Absolutely, no question about that.

24         Q    All right.  You didn't in your report

25     provide the results of any analysis of rhythmic

```
 1        Q    Have you ever spoken with Ernest Straughter?
 2        A    No.
 3        MR. ANDERSON:  Okay, thank you, sir.  Those are
 4   all the questions I have for you.
 5        THE WITNESS:  Thank you, sir.
 6        MR. DOWLING:  Do you have any more about Peter's
 7   subjects, Robert --
 8        MR. JACOBS:  I'm thinking.
 9        MR. DOWLING:  -- as long as we're on it?
10        MR. JACOBS:  I do not.
11        MR. DOWLING:  I've just got a couple of
12   questions.
13
14                       EXAMINATION
15   BY MR. DOWLING:
16        Q    Mr. Downes, you were asked whether you
17   consider Mr. Ferrara to be one of the leading
18   musicologists in the world and I believe you answered
19   in the affirmative, correct?
20        A    Yes.
21        Q    What did you mean by that?
22        A    He's -- I don't know.  He's been involved in
23   a number of cases for important firms, and that would
24   seem in itself to suggest that he is, you know, one
25   of the leading musicologists in the field.  We did
```

Barry E. Downes                                    7/7/2011

112

1    work in one case.

2        Q    Do you consider yourself qualified to assess

3    the quality of work of musicologists acting as

4    experts?

5        A    No, not in the quality of acting as experts.

6    Maybe their dinner manners or something.  I'm not

7    qualified.

8        Q    And have you ever worked with Dr. Ferrara?

9        A    Yes.

10       Q    In what case or cases?

11       A    I think it's the -- Janet Jackson, I think,

12   was the case, at the moment.  It came out of

13   California and I was hired by the law firm there.

14            And there had been a problem -- just to go

15   one step further in the question's, they hadn't had

16   at least what they felt was sufficient prior art and

17   they had called me in and we then did quite a bit of

18   work on that and did produce quite a bit of -- you

19   know, quite useful prior art that I think helped the

20   case.

21       Q    Okay.

22       A    And just one more step.

23            I didn't have a chance to really talk or

24   work with Larry at the beginning because he was in

25   the middle of another case so I sort of had to start

Barry E. Downes                                    7/7/2011

113

1    on my own a little bit.  And then we came together

2    and he started to then take the work and then did the

3    work that a musicologist should do with it.  And

4    obviously I was following his guidance.

5        Always I'm following the guidance of the

6    musicologist.  They're the boss.  They'd better be.

7        Q    In that -- in that matter, was a complaint

8    being made against Janet Jackson that she had

9    allegedly infringed something or was it being made by

10   her against somebody else, or what was it?

11       A    Oh, no, it was against her.  I think a song

12   probably that made a couple of bucks and somebody

13   decided or whatever.  But, no, I'm sure it was that.

14       I don't know if it was against her.  It

15   might have been against the composer but  she was the

16   featured artist in it, obviously.

17       Q    Was that actually a lawsuit or was it just a

18   complaint letter that you were responding to?

19       A    We did quite a bit of work.  It seemed like

20   more than just a complaint letter.  It seemed like

21   people -- you know, I wasn't really led to -- you

22   know, I sort of do my little compartment of the stuff

23   that I'm doing so I'm not led into it, but I have a

24   feeling -- I don't know where it ended.  But I know

25   that firm was, you know, spending appreciable money

114

1    on it.  I cost them appreciable money for the amount
2    of work was that done.
3         MR. JACOBS:  Move to strike.  nonresponsive
4    answer.
5         THE WITNESS:  Sorry, forgive me.
6    BY MR. DOWLING:
7         Q   Is the answer you don't recall specifically
8    whether it was actually a lawsuit?
9         A   I don't know for sure.
10        MR. DOWLING:  Thanks very much.  I have no
11   further questions.
12
13                    FURTHER EXAMINATION
14   BY MR. JACOBS:
15        Q   Mr. Downes, do you know by your own personal
16   knowledge that any of the work that you did with
17   Mr. Ferrara was actually relied upon by the litigants
18   in that case or the claiming party or defending
19   party?
20        A   I was certainly led to believe that from the
21   lawyer who had congratulated me about it.  The
22   details of the conversation --
23        Q   You have no personal knowledge one way or
24   the other, though, do you?
25        A   I don't have personal knowledge.

Barry E. Downes                                    7/7/2011

119

```
 1        MR. DOWLING:  Just one or two further on that
 2    same line.
 3
 4                    FURTHER EXAMINATION
 5    BY MR. DOWLING:
 6        Q    In that particular matter, as long as we're
 7    on it, did either Dr. Ferrara or any of the attorneys
 8    with whom he and you were working on that side of
 9    the case say or do anything that led you to believe
10    that they were making use of the information and work
11    you had provided to them?
12        A    Yes.
13        Q    What sorts of things did they say that led
14    you to believe that they were making use of your
15    work?
16        A    By their congratulations and how helpful the
17    work had -- how helpful the prior art had been.
18        Q    Did any of them discuss any of the
19    particular aspects of your work or any of your
20    particular comments or any of the particular
21    documents?
22        A    I don't think so.  I don't think that --
23    that came in, in particular, because it didn't
24    really need to.
25        MR. DOWLING:  Thanks very much.
```

**Barry E. Downes**                                          7/7/2011

126

1     STATE OF   *New York*          )
2                                    )   ss. 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
3     COUNTY OF  *New York*          )
4
5
6
7
8
9
10            I, the undersigned, say that I have read the
11    foregoing deposition, and I declare, under penalty of
12    perjury under the laws of the State of California,
13    that the foregoing is a true and correct transcript
14    of my testimony contained therein, incorporating any
15    and all changes and/or corrections as noted by me.
16            EXECUTED this  *19th* day of  *July*      ,
17    2011, at  *4:30 p.m.*
18
19
20    _____
              BARRY E. DOWNES
21
22
23
24
25