O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ERNEST LEE STRAUGHTER, | Case No. CV 08-2170 CAS (CWx) |
| Plaintiff, | |
| vs. | **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT** |
| USHER RAYMOND, IV, et al.; | |
| Defendants. | |

The Court finds this motion appropriate for decision without oral argument.  Fed.
R. Civ. P. 78; Local Rule 7-15.

## I.    INTRODUCTION

On May 14, 2008, plaintiff Ernest Lee Straughter filed the instant action.  On
April 3, 2009, plaintiff filed a second amended complaint ("SAC") for copyright
infringement against defendants Usher Raymond, IV, Jermaine Dupri Mauldin, Bryan-
Michael Paul Cox, EMI April Music, Inc., UR-IV Music, So So Def Productions, Inc.
(erroneously sued as "So So Def Recordings, Inc."), Babyboys Little Publishing
Company, Arista Records, LLC, Sony Music Entertainment, Zomba Recording, LLC,
LaFace Records, LLC, W.B.M. Music Corporation.[1]

---

[1] On November 25, 2009, the Court dismissed with prejudice defendants Broadcast
(continued...)

On January 21, 2011, defendants filed the instant motion for summary judgment or, in the alternative, for partial summary judgment.  On February 13, 2011, plaintiff filed an opposition to defendants' motion, and submitted the declaration of Dr. Cheryl L. Keyes, Ph.D. in support of his position.  Defendants replied on March 26, 2011.

On May 9, 2011, the Court entered an order excluding the opinions, reports, and testimony of Dr. Keyes on the grounds that she was retained on an improper contingent-fee basis.  See Dkt. 264.  The Court took defendants' motion for summary judgment under submission, and extended the discovery cutoff to allow plaintiff additional time to retain another expert witness.  In late June 2011, plaintiff filed expert reports by George S. Saadi, B.A., M.M.I., M.B.A. ("Saadi Report") and Barry E. Downes ("Downes Report").  See Dkts. 270–272.  On July 5, 2011, defendants' expert, Lawrence Ferrara, Ph.D., filed a response to the Saadi Report and the Downes Report ("Ferrara Supp. Report").  See Dkt. 273.  On July 29, 2011, the parties filed supplemental memoranda addressing the experts' reports.

After carefully considering the arguments set forth by both parties, the Court finds and concludes as follows.

## II.    FACTUAL BACKGROUND

Plaintiff claims that he has been a professional musician for more than forty years, composing and performing musical works in a variety of musical genres.  Declaration of Ernest L. Straughter ("Straughter Decl.") ¶¶ 2–13.  Sometime around 1997 or 1998, plaintiff and his brother, David Straughter, ("the Straughters") were introduced to Warren Griffin III, professionally known as "Warren G," through Warren G's uncle, "Wron G."  Id. ¶ 14.  According to plaintiff, Wron G contacted him in May 1998, and asked him to "sweeten" some recordings, by adding strings, keyboards, and background

---

[1](...continued)
Music, Inc., Columbia Records, J Records LLC, Fantasia Barrino, 19 Entertainment, Inc., Jumping Bean Songs, Johnta Austin, Ciara Harris, Soulsick Muzik, and Francisco Bautista, Jr.

parts, for an album by a group called "Reel Tight." Id. ¶ 15. Plaintiff agreed. Id.
Plaintiff claims that he began composing a song entitled "The Reasons Why"
("Reasons") in March or April 1998, and completed it in May 1998, during a break in
one of his sessions with Reel Tight. Id. ¶¶ 17–18; Straughter Depo. at 61:11–63:11.
According to plaintiff, when the members of Reel Tight returned to the studio from the
break, they heard him playing "Reasons" and wanted to record it, which they did.
Straughter Decl. ¶¶ 20–24.

   In June 1998, plaintiff registered a copyright for the song "Reasons" with the
Copyright Office as an unpublished musical composition. Id. ¶ 28, Exh. D (copyright
registration). Plaintiff used a copy of the "Reasons" recording he received from either
Warren G or Wron G as the deposit copy for the registration. Id. ¶ 27. Plaintiff included
his brother as a co-author on the copyright registration as a "goodwill gesture."[2] Id. ¶
28. The song "Reasons" was included on Reel Tight's album "Back to the Real" (the
"Album"), under the name "No More Pain" ("Pain"). Straughter Decl. ¶¶ 44–45; see
also Declaration of Robert A. Jacobs ("Jacobs Decl."), Exh. H (copy of the Album's
liner notes). The Album was released in late 1998 or early 1999, and Warren G was the
Album's executive producer. Jacobs Decl., Exh. H.

   Defendants Dupri, Cox, and Raymond co-wrote and recorded the song "Burn"
over several days in 2003 at Dupri's Southside Studios in Atlanta, Georgia. Defendants'
Statement of Uncontroverted Facts ("DSUF") ¶ 30; see also Plaintiff's Statement of
Genuine Disputes of Material Fact ("PSDF") ¶ 30 (undisputed). According to
defendants, Raymond created the song's concept and title, Dupri and Cox co-produced
it, and all three contributed to its music and lyrics. DSUF ¶¶ 31–32. The final version
of "Burn" was completed on May 8, 2003. DSUF ¶ 33; PSDF ¶ 33. "Burn" appeared on
Raymond's March 2004 album "Confessions." DSUF ¶ 34; PSDF ¶ 34; see also Jacobs

_____

[2] After this lawsuit was filed, David Straughter transferred to plaintiff his interest in
the "Reasons" copyright. Id. ¶ 28, Exh. C.

Decl., Exh. M ("Confessions" liner notes).

Plaintiff alleges that "Burn" infringes his copyright to the musical composition "Reasons." SAC ¶¶ 33–43.

## III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper

when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue.  See Matsushita, 475 U.S. at 587.

## IV.   DISCUSSION

### A.   Preliminary Arguments

#### 1.   Whether the "Reasons" Copyright Applies to "Pain"

Defendants argue that plaintiff's copyright infringement claim fails as a matter of law because plaintiff failed to adduce evidence that the "Reasons" copyright applies to "Pain."  Mot. at 13–15; Reply at 1–2.  When defendants filed the instant motion, plaintiff had not yet obtained the deposit copy of "Reasons" from the copyright office and, therefore, there was no way to verify plaintiff's assertion that the commercially-released song "Pain" is identical to "Reasons."  See Straughter Decl. ¶¶ 28–34.

Plaintiff has since received a certified duplicate recording of "Reasons" from the copyright office, and lodged a copy with the Court.  Both Saadi and Dr. Ferrara have compared the deposit copy of "Reasons" with "Pain" and determined that the two works are identical in all relevant respects.  After reviewing the two works, Saadi found "Pain" to be "musically identical" to "Reasons" in almost all significant respects.  Saadi Report ¶¶ 3, 22–28.  Dr. Ferrara generally agrees with Saadi's comparison, and opines that "Reasons" and "Pain" are "largely the same."  Ferrara Supp. Report ¶ 2.  Both experts note some differences in the lead vocals in "Pain," and that "Pain" is slightly longer than "Reasons," but the experts agree that these differences do not bear upon the claimed similarities at issue in this case.  See Saadi Report ¶¶ 24–38; Ferrara Supp. Report ¶ 2.

The Ninth Circuit addressed a nearly identical situation in Three Boys Music Corp. v. Bolton, 212 F.3d 477, 486–87 (9th Cir. 2000).  In that case, defendants argued that the district court did not have jurisdiction because the deposit copy of the copyrighted song differed from the recorded version of the song.  Id. at 486.  There was no evidence of intent to defraud or prejudice, and expert testimony at trial revealed that the deposit copy included all of the same musical elements as the recorded version of the song.  Id.  On these facts, the court refused to disturb the jury's finding that a complete

copy of the song was deposited with the copyright office, as required by the Copyright Act.  Id. at 486–87.

A reasonable jury could reach the same conclusion in this case.  In light of both experts' testimony that "Reasons" and "Pain" are identical in all material respects, and the absence of any evidence of plaintiff's intent to defraud, the Court finds that defendants are not entitled to summary judgment on the ground that the "Reasons" copyright does not apply to "Pain."  Three Boys, 212 F.3d at 486–87.  Hereafter, all references to "Reasons" will refer to both "Reasons" and "Pain."

## 2.   Unclean Hands

Defendants argue that plaintiff is barred from prevailing on his copyright infringement claim due to his unclean hands.  Mot. at 15–18.  The defense of unclean hands may apply in a copyright case to prevent a plaintiff "from recovering the legal remedy of damages . . . , even though a claim for damages would be an action at law." McCormick v. Cohn, No. CV 90-0323 H, 1992 WL 687291, at *3 (S.D. Cal. Jul. 31, 1992) (citing Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors, 786 F.2d 1400, 1408 (9th Cir. 1986)).

> [T]he defense of illegality or unclean hands is "recognized only rarely,
> when the plaintiff's transgression is of serious proportions and relates
> directly to the subject matter of the infringement action.  For instance,
> the defense has been recognized when plaintiff misused the process of
> the courts by falsifying a court order or evidence, or by misrepresenting
> the scope of his copyright to the court and opposing party."

Dream Games of Ariz., Inc. v. PC Onsite, 561 F.3d 983, 990–91 (9th Cir. 2009) (quoting 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.09[B] (2008)).

Defendants contend that plaintiff has misrepresented the scope of his of copyright by claiming that he alone owns 100 percent of the copyright in "Reasons."  Id. at 15. Defendants argue that contrary to plaintiff's representation, the evidence shows that plaintiff co-owns the copyright with members of Reel Tight and that plaintiff owns no

more than a 13 percent share of the copyright.  Id. at 16.  Defendants assert that in October 2008, plaintiff entered into a producer's agreement with G-Funk The New Millennium for the services he rendered on the "Reasons" recording.  DSUF ¶ 17.  At the time, plaintiff was represented by Lee Young, Jr.  PSDF ¶ 18.  On October 15, 1998, Young sent a letter to David Gerber, Vice President of Business Affairs at Restless Records – the record label that distributed the Album – discussing plaintiff's producer agreement and the division of the copyright in "Reasons."  The letter states that Young "underst[ands] from [plaintiff] that [plaintiff is] to receive 13% of 100% of the copyright" in "Reasons."  Jacobs Decl., Exh. K.  On October 20, 1998, Gerber responded by letter that he had been informed by Reel Tight's manager that plaintiff's "share of the copyright of the composition ["Reasons"] is 13%."  Id., Exh. L. Defendants argue that this correspondence shows that plaintiff and the members of Reel Tight agreed that plaintiff owns only 13 percent of the copyright in the commercially-released version of "Reasons."  Mot. at 16.

Defendants further maintain that the credits in the Album's liner notes, stating that "Reasons" was "written by" the four members of Reel Tight and the Straughters, contradicts plaintiff's representations regarding the scope of his copyright ownership. Mot. at 17; see PSDF ¶ 24.  It is uncontroverted that plaintiff has known since the end of 1998 that the Album's liner credits list him, his brother, and the Reel Tight band members as the writers of "Reasons."  PSDF ¶ 25.  Plaintiff testified that he was upset that the liner credits list the members of Reel Tight as co-writers of "Reasons," and that he raised the issue with Warren G at the time, but did not pursue it further.  Straughter Decl. ¶ 40.  Plaintiff stated that he did not pursue the issue further because he had already registered the copyright in his own name, and because "the album was a frisbee," i.e., "going nowhere [commercially.]"  PSDF ¶ 28; Straughter Depo. at 96:24–97:22.

Defendants also argue that plaintiff's assertion of sole ownership is contradicted by Robert Rice and Reginald Long, two of the four members of Reel Tight.  Mot. at 4. Both Rice and Long testified that they wrote "Reasons" before meeting plaintiff, and

7

that plaintiff's only contribution to the song was to add guitar and keyboard parts.  See
Long Depo. at 99:2–100:16; Rice Depo. at 58:25–60:16, 62:10–19.

Against this backdrop, defendants argue that plaintiff has misrepresented the
scope of his interest in the "Reasons" copyright.  Mot. at 17.  Defendants contend that
plaintiff has held himself out as owning 100 percent of the "Reasons" copyright, when,
in fact, he knew that he owned no more than 13 percent or, at a minimum, that he jointly
owned the copyright with the members of Reel Tight.  Id.

The circumstances of this case do not warrant a finding that plaintiff has unclean
hands due to misrepresenting the scope of his copyright.  As an initial matter, the Court
finds that there is a genuine issue of material fact as to plaintiff's ownership share in the
"Reasons" copyright.  For example, the testimony of Rice and Long is contradicted by
plaintiff's testimony that he alone created "Reasons."  Straughter Decl. ¶¶ 18, 20–24;
Straughter Depo. at 61:11–63:11.

Furthermore, plaintiff questions the validity of the alleged agreement limiting his
ownership to 13 percent of the copyright.  Plaintiff states that he first saw the
correspondence between Young and Gerber in the context of this litigation, and that he
never authorized Young to limit his ownership in the "Reasons" copyright.  Straughter
Decl. ¶¶ 42–43.  Moreover, the only evidence of such an agreement is the
correspondence between Young and Gerber, and defendants have not produced a signed,
authentic agreement.  Finally, plaintiff points out that he registered the copyright in
"Reasons" prior to the alleged agreement, and there has never been any assignment of
his copyright.

Even if plaintiff only owns a 13 percent share of the "Reasons" copyright,
plaintiff's infringement claim would not be barred by the doctrine of unclean hands.
Relying upon Nimmer on Copyright, the Ninth Circuit has recognized that a plaintiff's
claim may be barred by the doctrine of unclean hands where he or she misrepresents the
scope of the copyright to the court and opposing party.  See Dream Games, 561 F.3d at
991 (quoting 4 Nimmer on Copyright, § 13.09[B]).  In support of this proposition,

8

Professor Nimmer cites Qad. Inc. v. ALN Assocs., Inc., 770 F. Supp. 1261, 1266–70 (N.D. Ill. 1991), aff'd 974 F.2d 834 (7th Cir. 1992).  Qad is inapposite, however, and does not compel a finding of unclean hands in this case.  The plaintiff in Qad held a copyright in a computer program, and sued an alleged infringer to enjoin it from copying the program.  Id. at 1264.  Based on plaintiff's representations regarding copyright ownership, the district court preliminarily enjoined a competitor's use of plaintiff's copyrighted software.  Id.  After a preliminary injunction was entered, the court discovered that plaintiff had misrepresented that its software was completely original when, in fact, it was largely derivative of software developed by a third party.  Id. at 1267–68.  Thus, the court found that plaintiff's misrepresentation of the scope of its copyright "to gain control of components over which it ha[d] no [copyright]" was a complete bar to plaintiff's infringement action.  Id. at 1267.

Unlike Qad, plaintiff has not attempted to use his copyright in "Reasons" to extend control over material in which he holds no copyright.  See Survivor Prods. LLC v. Fox Broad. Co., No. CV 01-3234 LGB (SHX), 2001 WL 35829270, at *5 (C.D. Cal. Jun. 12, 2001) (distinguishing Qad on the same grounds).  Furthermore, defendants fail to show that they have suffered prejudice due to the alleged misrepresentation.  See Harris v. Emus Records Corp., 734 F.2d 1329, 1335 (9th Cir. 1984) (absent prejudice, inaccuracy in copyright registration does not bar copyright infringement action); see also Testa v. Janssen, 492 F. Supp. 198, 201 (W.D. Pa. 1980) (misrepresentation in copyright registration with respect to authorship of composition did not invoke doctrine of unclean hands to invalidate copyright infringement action where no prejudice resulted from misrepresentation).  Here, the only prejudice defendants point to is the possibility that plaintiff may "obtain a significantly greater damage award in the event that he were to prevail."  Mot. at 17.  However, the Court has not determined the scope of plaintiff's ownership in the "Reasons" copyright, much less awarded him damages.

Accordingly, the Court concludes that plaintiff's copyright infringement action is not barred by the doctrine of unclean hands.

**B.     Copyright Infringement**

In order to establish copyright infringement, plaintiff must show (1) ownership of the copyright; and (2) that defendant copied protected elements of his work.  Swirsky v. Carey, 376 F.3d 841, 844 (9th Cir. 2004).  "Proof of copyright infringement is often highly circumstantial, particularly in cases involving music."  Three Boys, 212 F.3d at 481.

**1.     Copyright Ownership**

Copyright ownership is always a threshold question in copyright infringement actions.  Lamps Plus, Inc. v. Seattle Lighting Fixture Co., 345 F.3d 1140, 1143 (9th Cir. 2003).  Registration of a copyright certificate constitutes a prima facie presumption of the validity of a copyright in judicial proceedings, where "registration [is] made before or within five years after first publication of the work."  17 U.S.C. § 410(c); see also United Fabrics Int'l, Inc. v. C&J Wear, Inc., 630 F.3d 1255, 1257 (9th Cir. 2011) ("A copyright registration is 'prima facie evidence of the validity of the copyright and the facts stated in the certificate.'") (quoting 17 U.S.C. § 410(c)); Three Boys, 212 F.3d at 488–89 ("Registration is prima facie evidence of the validity of a copyright.").  Here, plaintiff obtained a copyright for "Reasons" on June 9, 1998, before the song was first published.  PSDF ¶ 1; Straughter Decl., Exh. D.  Thus, plaintiff is entitled to a presumption of copyright validity.  17 U.S.C. § 410(c).

The Court rejects defendants' argument that plaintiff is not entitled to a presumption of copyright validity because he filed suit nearly ten years after he obtained his copyright registration.  Mot. at 15–16.  The Court is cognizant of language in some Ninth Circuit cases suggesting that registration of a copyright constitutes prima facie evidence of copyright validity only when the judicial proceeding is commenced within five years of the copyright's publication.  See Lamps Plus, 345 F.3d at 1144 ("Under the copyright laws, the registration of a copyright certificate constitutes prima facie evidence of the validity of a copyright in a judicial proceeding commenced within five years of the copyright's first publication.") (quoting Entm't Research Group, Inc. v. Genesis

Creative Group, Inc., 122 F.3d 1211, 1217 (9th Cir. 1997)); N. Coast Indus. v. Jason Maxwell, Inc., 972 F.2d 1031, 1033 (9th Cir. 1992) ("Under our copyright law, the registration of the copyright certificate itself establishes a prima facie presumption of the validity of the copyright in a judicial proceeding if, as here, the judicial proceeding is commenced within five years of the copyright's first publication."); see also Newton v. Diamond, 204 F. Supp. 2d 1244, 1252–53 (C.D. Cal. 2002), aff'd on other grounds, 388 F.3d 1189 (9th Cir. 2004) (plaintiff not entitled to presumption of copyright validity where he commenced suit more than 20 years after he registered his copyright).  As noted by Chief Judge Walker in Walker & Zanger, Inc. v. Paragon Indus., Inc., 549 F. Supp. 2d 1168, 1183 (N.D. Cal. 2007), these cases misquote section 410(c), which by its plain language requires granting a presumption of copyright validity when "the certificate of a registration [is] made before or within five years after first publication of the work." 17 U.S.C. § 410(c) (emphasis supplied).

Because plaintiff enjoys a presumption of copyright validity, the burden shifts to defendants to prove the invalidity of the copyright.  Lamps Plus, 345 F.3d at 1144.  To do so, defendants must "offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement."  Id. (quoting Entm't Research Group, 122 F.3d at 1217).

In their moving papers, defendants argue that plaintiff's copyright ownership is called into question by the evidence in the record suggesting that plaintiff may not own 100 percent of the "Reasons" copyright. Mot. at 16.  As discussed above, however, the Court finds that there is a triable issue of fact as to plaintiff's share of the "Reasons" copyright.  Furthermore, even if plaintiff only owns a share of the "Reasons" copyright, he still has standing to sue defendants for copyright infringement as a co-owner.  See Davis v. Blige, 505 F.3d 90, 99 (2d Cir. 2007) (co-owner not required to join other co-owners in an action for copyright infringement).

Defendants also argue that plaintiff's work is not original.  See Reply at 24–25; Songwriters' Supp. Mem. at 6.  As an initial matter, defendants misapprehend the burden

of proof based on their faulty argument that plaintiff is not entitled to a presumption of copyright validity. See, e.g., Songwriters' Supp. Mem. at 6 ("Plaintiff does not enjoy a presumption of copyright validity or originality, and therefore, must demonstrate that the 18 elements at issue are original to him."). As discussed above, it is defendants' burden to rebut the statutory presumption of validity. Defendants can do so by demonstrating "that the plaintiff's work is not original but copied from another's work." Lamps Plus, 345 F.3d at 1146 (internal quotation marks omitted). The Ninth Circuit's definition of originality is quite broad: "All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.' Originality in this context means little more than a prohibition of actual copying." Three Boys, 212 F.3d at 489 (internal quotation marks omitted).

The Court finds that defendants' evidence does not establish that "Reasons" is unoriginal. In support of their position, defendants primarily rely upon the expert testimony of Dr. Ferrara. Dr. Ferrara's testimony on originality is similar to the type of expert testimony the Ninth Circuit called into question in Swirsky. In Swirsky, the court held that an expert's testimony that a measure of a copyrighted rhythm and blues ("R&B") song was similar to a measure of a previously released folk song was insufficient to establish that the measure was unprotectable. Swirsky, 376 F.3d at 850. The Swirsky court also rejected defendants argument that the plaintiff's work lacked copyright protection because its chorus was similar to other another song's chorus. Id. at 850–52. As in Swirsky, Dr. Ferrara attempts to show that elements of "Reasons" are unoriginal by comparing those elements to previously released R&B songs, and songs in other genres. See, e.g., Ferrara Supp. Report ¶¶ 5–7, 11, 20, 28, 31, 46–49, 62–68, 72, 80–83, 88, 93–103. The Court finds that Dr. Ferrara's testimony fails to establish as a matter of law that plaintiff copied certain musical elements from other works or did not contribute some nontrivial variation to them. Accordingly, defendants have not carried their burden of establishing that plaintiff copied protected elements in "Reasons" from

another work.[3]  See Three Boys, 212 F.3d at 489 (rejecting copyright invalidity claim based on lack of originality where plaintiff "contributed something original" to song).

In sum, the Court concludes that defendants are not entitled to summary judgment on the issue of plaintiff's copyright ownership.

### 2.   Infringement

Where, as here, there is no direct evidence of copying, "proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'"  Three Boys, 212 F.3d at 481.

### i.   Access

"To prove access, a plaintiff must show a reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work."  Art Attacks Ink, LLC v. MGA Entm't Inc. ("Art Attacks II"), 581 F.3d 1138, 1143 (9th Cir. 2009).  "Of course, reasonable opportunity as here used, does not encompass any bare possibility in the sense that anything is possible.  Access may not be inferred through mere speculation or conjecture.  There must be a reasonable possibility of viewing the plaintiff's work–not a bare possibility."  Three Boys, 212 F.3d at 482 (quoting 4 Nimmer on Copyright, § 1302[A]).  Where there is no direct evidence of access, circumstantial evidence can be used to prove access either by (1) a particular chain of events between the plaintiff's work and the defendants' access to that work (such as through dealings with a publisher or record company), or (2) showing that the plaintiff's work has been widely disseminated.  Id.

### a.   Chain of Events

Plaintiff offers two primary chain of events theories linking "Reasons" to defendants: (1) that defendants had access to "Reasons" through a series of contacts between Raymond and the members of Reel Tight, and (2) that Warren G was as a third

---

[3] Because the Court finds that defendants have not established that "Reasons" is unoriginal, the Court does not rely upon, and declines to express an opinion as to, the testimony of Downes, plaintiff's "prior art" expert.  See generally Downes Report.

party intermediary who had access to "Reasons" and passed the song on to defendants.
Opp'n at 17–24.

Contacts Between Raymond and Reel Tight

In his first chain of events theory, plaintiff attempts to establish defendants' access
to "Reasons" through a convoluted series of personal contacts and purported
collaborations between Raymond and the members of Reel Tight.  See Opp'n at 23.
Plaintiff's claims of a "long history of personal contacts and collaborations" among
Raymond and Reel Tight lack evidentiary support.  Id.  Raymond's deposition testimony
merely establishes that he recalled having met in passing one or more members of Reel
Tight on one occasion prior to 1993, and that he "probably" met in passing one or more
of them again on another occasion after 1993.  Raymond Depo. at 64–75.  Similarly,
Reel Tight band member Long's testimony does not support a finding that Raymond had
access to "Reasons."  Long testified that he first met Raymond in Chattanooga,
Tennessee (where members of Reel Tight and Raymond grew up), in 1989.  Long Depo.
at 61:11–62:3.  Although Long testified that Raymond attended Reel Tight's practices in
Tennessee, that was nearly a decade before "Reasons" was created.  Id. at 62:9–24.
Furthermore, Long's testimony in no way establishes a long history or ongoing series of
connections between Reel Tight and Raymond.  See Long Depo. at 61–65.

Moreover, plaintiff's argument that Usher and members of Reel Tight are of
similar age and have common backgrounds is insufficient to establish access.  See Opp'n
at 23 (citing Raymond Depo. at 51–56, 64–80; Long Depo. at 17, 28, 31–39, 43–44,
48–49, 61–65; Rice Depo. at 17, 22–29; Straughter Decl. ¶¶ 56–58).  Even crediting
plaintiff's version of the facts, which defendants' contest (see Reply at 7–9), Raymond
moved from Chattanooga to Atlanta in 1993 – five years before plaintiff wrote
"Reasons."  Raymond Depo. at 67:24–68:2.  Because plaintiff has adduced no evidence
of an ongoing relationship between Raymond and Reel Tight, plaintiff has failed to
establish that Raymond had access to "Reasons" through Reel Tight.  See Art Attacks
Ink, LLC v. MGA Entm't, Inc. ("Art Attacks I"), Civil No. 04 CV 1035-B(BLM), 2007

WL 1989631, at *2 (S.D. Cal. Jul. 2, 2007), aff'd, 581 F.3d 1138 (9th Cir. 2009) ("the geographic proximity of [defendants'] work and residence (for a limited amount of time) near and around Los Angeles to the fairs in Southern California at which [plaintiff] exhibited [the allegedly infringed] work" is insufficient to establish access); Jorgensen v. Careers BMG Music Publ'g, No. 01 Civ. 0357(LAP), 2002 WL 1492123, at *4 (S.D.N.Y. Jul. 11, 2002) ("Plaintiff's allegations that the writers of [the allegedly infringing song] and the writers of other hit songs allegedly copied his work simply because they work and live in the same environment is wholly speculative.")).

Finally, the fact that Raymond's name appears in the acknowledgments section of the Album's liner notes does not support a "reasonable possibility" of Raymond's access to "Reasons." See Art Attacks II, 581 F.3d at 1143.

The Court concludes that plaintiff's theory of access based on the connections between Reel Tight and Raymond is based on nothing more than "mere speculation or conjecture." Three Boys, 212 F.3d at 482.

Warren G as Third Party Intermediary

Plaintiff argues that as the producer of the Album, Warren G had access to "Reasons" and passed it on to defendants, with whom Warren G regularly collaborated on other projects. Opp'n at 19. In support of his argument, plaintiff relies on his own declaration and attached exhibits. According to plaintiff, Warren G is a friend of Dupri and Raymond, and collaborated with them on projects during the same time period when "Reasons" was released. Plaintiff further claims that there is a "long history of collaborations and professional connections" among Warren G, Raymond, Dupri, and Cox, spanning from the early 1990s through the release of "Confessions." Straughter Decl. ¶ 55.[4] Thus, plaintiff maintains that Warren G was a third party intermediary who

---

[4] Plaintiff also states that Rice and Warren G told him that they gave copies of the Album to Raymond and Dupri. Straughter Decl. ¶¶ 38–39. Defendants object to these statements as inadmissible hearsay. Mot. at 6–7, 22. Plaintiff responds in a footnote that
(continued...)

had access to "Reasons," and who could have given a copy of the song to defendants. Opp'n at 19**.**

As an initial matter, the Court must address defendants' argument that the majority of plaintiff's evidence regarding Warren G's access to defendants is inadmissible. <u>See</u> Reply at 10–11. Defendants contend that plaintiff has no personal knowledge of the collaborations between Dupri and Warren G on Dupri's album "Life in 1472," and that much of plaintiff's testimony is based upon hearsay statements by undisclosed authors of Wikipedia and other internet websites. <u>Id.</u> at 10–11 (citing Straughter Decl., Exhs. I, J, L, M, O–R).

The Court finds that plaintiff may not rely upon Wikipedia and other unverified internet websites as admissible evidence of facts supporting his third party intermediary theory. <u>See generally</u> <u>Crispin v. Christian Audigier, Inc.</u>, 717 F. Supp. 2d 965, 976 n.19 (C.D. Cal. 2010) (summarizing evidentiary dangers of relying upon Wikipedia as authoritative evidence). In his declaration, however, plaintiff also includes what appear to be authentic album covers and liner notes from the various albums he cites. The Court finds that this evidence is admissible, and relies upon the album covers and liner

---

[4](...continued)

the statement by Warren G is admissible as a prior inconsistent statement because defendants submitted a declaration from Warren G contradicting plaintiff's testimony. Opp'n at 19 n.1. Plaintiff does not explain a theory of admissibility for the statement by Rice. The Court concludes that the statements by both Warren G and Rice are inadmissible hearsay. <u>See</u> Fed. R. Evid. 801(c). Plaintiff's contention that the statement by Warren G is admissible as a prior inconsistent statement is contrary to the plain language of Rule 801(d)(1)(A) and Ninth Circuit law, which establish that prior inconsistent statements by witnesses are limited to those statements made under oath, which Warren G's statement to plaintiff was not. <u>See</u> <u>United States v. Armijo</u>, 5 F.3d 1229, 1232 (9th Cir. 1993) ("[Witness's] prior inconsistent statement was inadmissible under Rule 801(d)(1)(A) . . . because it was not given under oath."). Accordingly, the Court does not rely on this portion of Straughter's declaration in determining whether defendants had access to "Reasons." <u>See</u> <u>Orr v. Bank of Am., NT & SA</u>, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").

notes in determining this aspect of the motion.[5]

Having determined the scope of admissible evidence regarding plaintiff's third party intermediary theory, the Court addresses defendants' substantive opposition to plaintiff's theory. Defendants do not deny that Warren G had access to "Reasons." Instead, they argue that the relationships between Warren G and defendants do not support a finding of access. Reply at 11–16. Defendants argue that plaintiff's characterization of the connections between Warren G and Raymond and Dupri is overblown. Id. at 13–15. Defendants maintain that the evidence shows that Raymond has only met Warren G on one or two occasions, and that Raymond could not recall whether those meetings took place between 1998 (when "Reasons" was recorded) and 2004. Id. at 13 (quoting Raymond Depo. at 34:1–9 (recalling that Raymond met Warren G "within the last 10 years.")). Defendants further contend that plaintiff's argument that Warren G and Raymond worked together is pure speculation. Id. at 13–14. According to defendants, there are two albums that contain one song written or featuring a performance by Raymond and one or more different songs written or featuring a performance by Warren G – the 1993 soundtrack album for the movie "Poetic Justice" and Dupri's July 1998 album "Life in 1472." Id. at 13–14 (citing Straughter Decl. ¶ 55(a), (c)). Defendants argue that plaintiff's theory is contradicted by Warren G's Reply Declaration, wherein Warren G states that he did not work with Raymond on "Poetic Justice" or "Life in 1472." See Warren G Reply Decl. ¶¶ 6, 8–11. Defendants contend that the mere fact that an album may contain different songs involving different artists does not create an inference that the artists actually worked together. Reply at 14. Defendants argue that even if plaintiff could show that Warren G and Raymond worked

---

[5] The Court specifically relies upon information from the following album covers and liner notes: (1) "Life in 1472" ( Straughter Decl., Exh. I); (2) "Poetic Justice" (Straughter Decl., Exh. L); (3) "My Way" (Straughter Decl., Exh. M); (4) "I Want It All" (Straughter Decl., Exh. O); and (5) "Big Momma's House" ("House") (Straughter Decl., Exh. P).

together on "Poetic Justice" or "Life in 1472," it would be irrelevant because any such collaboration would have predated the creation of "Reasons" and, therefore, cannot support an inference of access.  Id.

Similarly, defendants argue that the evidence does not support plaintiff's claim that Warren G and Dupri had numerous, substantial, and direct connections.  Id. at 14–15.  Defendants acknowledge that "House" has one song co-written and produced by Warren G and a number of different songs co-written by Dupri and Cox and featuring performances by Dupri.  Id. at 14 (citing Straughter Decl. ¶ 55(f)).  However, defendants assert that the declarations of Warren G, Dupri, and Cox establish that Warren G did not work with Dupri or Cox in connection with "House."  Id. at 14 (citing Warren G Reply Decl. ¶¶ 12–15; Dupri Reply Decl. ¶¶ 8–11; Cox Reply Decl. at 2).  Furthermore, defendants argue that the two songs plaintiff identifies on which Warren G and Dupri collaborated preceded "Burn's" creation by four and five years – "Protector's" on Dupri's 1998 album "Life in 1472" and "Havin' Things" on Warren G's 1999 album "I Want It All."  Id. at 15 (citing Straughter Decl. ¶ 55(c), (e)).  Defendants further contend that "Protector's" is irrelevant to establish access altogether because it predates the creation of "Reasons."  Id.

Finally, defendants argue that they are entitled to summary judgment on plaintiff's access theory because Warren G has testified that he never gave Raymond, Dupri, or Cox a copy of "Reasons," and plaintiff has adduced no facts raising a question about Warren G's credibility.  Id. at 15–16 (citing Meraz v. Jo-Ann Stores, Inc., No. CV 03-2914 GAF, 2004 WL 882458, at *16 (C.D. Cal. Apr. 2, 2004) ("If Plaintiff truly believed that affiant's testimony is not credible, then it was incumbent upon her to depose them or otherwise explore their testimony during discovery and attempt to expose any inconsistencies in their testimony which could cast doubt on their affidavits. Plaintiff has not done so, and thus these affidavits are now uncontradicted.") (internal citation omitted)).

To establish his third party intermediary theory, "plaintiff must show that he

submitted his work to an intermediary <u>who is in a position to transmit the plaintiff's work to the creators of the infringing work</u>." <u>Gable v. Nat'l Broad. Co.</u>, 727 F. Supp. 2d 815, 826 (C.D. Cal. 2010) (emphasis in original).  "[E]vidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by defendant."  4 <u>Nimmer on Copyright</u>, § 1302[A], at 13–17.  However, plaintiff cannot defeat summary judgment merely by showing "bare corporate receipt" of his work by an individual who shares a common employer with defendants.  <u>Gable</u>, 727 F. Supp. 2d at 826; <u>see also</u> <u>Meta-Film Assocs., Inc. v. MCA, Inc.</u>, 586 F. Supp. 1346, 1358 (C.D. Cal. 1984); <u>Jorgensen v. Epic/Sony Records</u>, 351 F.3d 46, 52 (2d Cir. 2003).

    Although the evidence supporting plaintiff's third party intermediary is relatively weak, the Court finds that it is sufficient to create a genuine issue of material fact as to defendants' access to "Reasons."  The Court agrees with defendants that the fact that an album contains songs involving Warren G and Dupri or Raymond does not automatically trigger an inference that the artists actually collaborated; especially in light of those artists' uncontroverted testimony that they did not work together.  However, such evidence tends to establish that plaintiff, Warren G, and defendants run in the same musical circles.  <u>See</u> <u>Bernal v. Paradigm Talent & Literary Agency</u>, --- F. Supp. 2d ----, -----, 2010 WL 6397587, at *7 (C.D. Cal. Feb. 22, 2010) ("At a minimum, . . . 'the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access.'") (quoting <u>Meta-Film</u>, 586 F. Supp. at 1355–56).  Furthermore, defendants are correct to point out that Warren G could not have used his collaboration with Dupri on the song "Protector's" as an opportunity to provide Dupri with a copy of "Reasons," because "Reasons" had not yet been produced.  However, the fact that Warren G had a preexisting relationship with Dupri that continued after "Reasons" was released supports plaintiff's argument that Warren G was "in a position to transmit the plaintiff's work to [Dupri – one of] the creators of the infringing work." <u>Gable</u>, 727 F. Supp. 2d at 826

(emphasis omitted).  In fact, the evidence in the record establishes that Warren G and Dupri were in contact in the time period immediately after the creation of "Reasons." Shortly after "Reasons" was released, Dupri performed the song "Havin' Things" on Warren G's 1999 album "I Want It All."  See Straughter Decl. ¶ 55, Exh. O.  Although more than four years passed before "Burn" was created, the Ninth Circuit has held that "the mere lapse of a considerable period of time between the moment of access and the creation of defendant's work does not preclude a finding of copying."  Three Boys, 212 F.3d at 483 (quoting 4 Nimmer on Copyright, § 13.02[A], at 13–20); see also ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 997–98 (2d Cir. 1983) (finding access where alleged infringing work was crated six years after first access to infringed work).  Viewing the evidence in the light most favorable to plaintiff, the Court concludes that there is a reasonable possibility that Warren G provided defendants with a copy of "Reasons."  Three Boys, 212 F.3d at 482.

### b.    Wide Dissemination

Plaintiff does not argue in his opposition brief that "Reasons" was widely disseminated.  Nevertheless, in his declaration, plaintiff states that "it has been reported" that the Album (1) reached numbers 13, 32, and 192 on different Billboard Charts and (2) sold "something in excess of 50,000 copies."  Straughter Decl. ¶ 49.  In support of his testimony on the Album's position on the Billboard Charts, plaintiff submits two pages from the Wikipedia website.  See Straughter Decl., Exh. J.  Plaintiff's statement regarding the purported Album sales is not supported by any documentary evidence in the record.

Defendants argue that the Court should disregard plaintiff's evidence regarding dissemination because plaintiff's statements are (1) not based on personal knowledge, (2) inadmissible hearsay, and (3) otherwise unsupported.  Reply at 17–18.  Defendants further contend that the Wikipedia documents in Exhibit J to plaintiff's declaration are inadmissible because they are hearsay and the documents are not authenticated.  Id. at 18.  Finally, defendants argue that any admissible evidence plaintiff proffers regarding

dissemination is contradicted by his own testimony that the Album was a commercial failure. Id. at 17.

As discussed in the preceding section, plaintiff may not rely upon Wikipedia as admissible evidence to support his contention that the Album was widely disseminated. Crispin, 717 F. Supp. 2d at 976 n.1.  However, the Court has found independent evidence from Billboard's official website to support plaintiff's contention that, on June 5, 1999, the Album reached numbers 197 on the "Billboard 200" and 32 on the "Billboard R&B/Hip Hop" Charts.  See http://www.billboard.com/charts#/album/reel-tight/back-to-the-real/348988 (last accessed August 15, 2011).  The Court takes judicial notice of these facts.  See Fed. R. Evid. 201.  The Court has found no evidence to verify plaintiff's claim that the Album sold "something in excess of 50,000 copies," and therefore does not rely upon this statement.

The Court recognizes that the Album's position on the Billboard Charts is weaker than other cases finding access through dissemination.  See, e.g., Acuff-Rose Music, Inc. v. Jostens, Inc., 988 F. Supp. 289, 293 (S.D.N.Y. 1997), aff'd, 155 F.3d 140, 141 (2d Cir. 1998) (widespread dissemination where plaintiff's song had achieved a "top five ranking as a country hit at the time" that defendant allegedly infringed plaintiff's work); ABKCO Music, 722 F.2d at 997–98 (widespread dissemination where song was "Number One on the Billboard Charts" for five weeks in the United States and one of the "Top Thirty Hits" for seven weeks in England).  And plaintiff has not adduced admissible evidence of how many copies the Album sold.  Compare Rice v. Fox Broad Co., 330 F.3d 1170, 1178 (9th Cir. 2003) (sale of 17,000 copies of video insufficient to show that video was widely disseminated); Jason v. Fonda, 526 F. Supp. 774, 776 (C.D. Cal. 1981), aff'd, 698 F.2d 966 (9th Cir. 1982) (book sales of no more than 2,000 copies nationwide and 700 in Southern California only creates bare possibility of access) with Arnstein v. Porter, 154 F.2d 464, 469 (2d Cir. 1946) (finding access where "more than a million copies of one of [plaintiff's] compositions were sold; copies of others were sold in smaller quantities or distributed to radio stations or band leaders or publishers, or the

21

1  pieces were publicly performed").

2  Nevertheless, drawing all reasonable inferences in the light most favorable to
3  plaintiff, the Court finds that there is a reasonable possibility that defendants had access
4  to "Reasons" through its widespread dissemination.  Two factors weigh in favor of
5  finding an inference of access based on widespread dissemination in this case.  First, the
6  Album reached number 32 on the Billboard Chart which lists the most popular songs in
7  R&B and hip hop – the same musical genres in which defendants perform.  Second,
8  defendants testified that they have heard hundreds of thousands of songs from a variety
9  of artists over the years.  See Dupri Depo. at 60:17–61:15; Cox Depo. at 65:3–18.  Given
10  that the Album achieved some level of notoriety in the R&B genre at the same time
11  defendants were actively creating R&B music, and defendants' admission that they have
12  heard thousands of songs from countless artists, a reasonable jury could conclude that
13  there is more than a "bare possibility" that defendants had the opportunity to hear
14  "Reasons."  Cf. Three Boys, 212 F.3d at 483–85 (upholding jury's finding of access
15  based on a theory of widespread dissemination and subconscious copying).

### c.    Inverse Ratio Rule

16  
17  Although the Court concludes that there is a triable issue of fact as to whether
18  defendants had access to "Reasons," plaintiff's access evidence is insufficient to trigger
19  the "inverse ratio rule," whereby a reduced standard of proof of substantial similarity is
20  required when a high degree of access is shown.  See Three Boys, 212 F.3d at 485.  The
21  evidence that defendants had access to "Reasons" is sufficient to survive summary
22  judgment, but not "more compelling . . . than that which is offered in the usual copyright
23  case."  Idema v. Dreamworks, Inc., 162 F. Supp. 2d 1129, 1176 (C.D. Cal. 2001); see
24  also Rice, 330 F.3d at 1178 (noting that in most circumstances where the inverse ratio
25  rule has been applied, the defendant has conceded access).

### ii.    Substantial Similarity

26  
27  In order to determine whether two works are substantially similar, the Ninth
28  Circuit employs a two-part test consisting of extrinsic and intrinsic components.

Swirsky, 376 F.3d at 845. "For the purposes of summary judgment, only the extrinsic test is important because the subjective question whether works are intrinsically similar must be left to the jury." Id. "The extrinsic test often requires analytical dissection of a work and expert testimony." Three Boys, 212 F.3d at 485. The extrinsic test demands similarity in "*protected* elements of the copyrighted work. . . ." Swirsky, 376 F.3d at 845 (emphasis in original). Thus, "it is essential to distinguish between the protected and unprotected material in a plaintiff's work." Id. The Ninth Circuit has never announced a uniform set of factors for analyzing a musical composition under the extrinsic test. Id. at 849. This is because a musical composition can be comprised of a number of otherwise unprotectable elements, including lyrics, rhythm, pitch, cadence, melody, harmony, tempo, phrasing, structure, chord progression, instrumental figures, and others. Id. ("Music, like software programs and art objects, is not capable of ready classification into only five or six constituent elements; music is comprised of a large array of elements, some combination of which is protectable by copyright."). "So long as the plaintiff can demonstrate, through expert testimony that addresses some or all of these elements and supports its employment of them, that the similarity was 'substantial' and to 'protected elements' of the copyrighted work, the extrinsic test is satisfied." Id.

In support of his argument on substantial similarity, plaintiff primarily relies upon the expert report submitted by Saadi.[6] On the basis of his aural assessment of "Reasons"

_____

[6] As discussed above, the Court excluded the opinions, reports, and testimony of plaintiff's prior expert, Dr. Keyes, on the grounds that she was retained on an improper contingent-fee basis. See Dkt. 264.

The Court finds that Saadi is qualified to offer an opinion regarding the similarity of "Reasons" and "Burn." See Fed. R. Evid. 702. Saadi received a Bachelor of Music degree from the Berklee School of Music, as well as a Master's Degree in Music Industry from the University of Miami. Saadi Report ¶ 5. Although he has not previously testified as an expert witness on musicology, his experience includes years of work with the late-forensic musicologist, Irwin Coster. Id. ¶ 6. Defendants suggest that Saadi is somehow
(continued...)

and "Burn," and his review of the musical transcriptions of the compositions, Saadi opines that several musical elements in "Burn" are substantially similar to corresponding elements in "Reasons." Saadi Report ¶ 3. According to Saadi, "Reasons" and "Burn" share substantially similar introductions, overall structure and spatial organization, repeated melodic sequences, harmonic progressions, and uses and placements of melisma.[7] Id. ¶¶ 30–45. Saadi further identifies what he terms "other similarities" between the two works. Id. ¶¶ 46–48. In Saadi's opinion, when the works are viewed in their entirety, "Burn" is strikingly similar to "Reasons." Id. ¶ 49.

According to Saadi, "Reasons" and "Burn" both have a "highly unusual" 18-bar[8] introduction that is rare in any musical genre, but especially in the R&B genre. Id. ¶ 30. Saadi points out that both songs' introductions are divided into two segments – one 10 measures in length and the other 8 measures. Id. Furthermore, Saadi states that the same musical instruments enter at the exact same bars. Id. at ¶ 31. For example, Saadi notes that strings enter at bar 3, the drum beat and arpeggiated[9] guitars enter at bar 11,

---

[6](...continued)

unqualified to offer an opinion in this case because he is plaintiff's counsel's client. Record Labels' Supp. Mem. at 1; Songwriters' Supp. Mem. at 2. Defendants' argument, however, goes to whether Saadi is biased; not whether he is qualified. See United States v. Abonce-Barrera, 257 F.3d 959, 965 (9th Cir. 2001) (DEA agent who actively participated in drug case's investigation properly qualified as expert, because evidence of bias goes to witness's credibility, not competency to testify).

[7] Saadi defines "melisma" as "a group of notes sung to one syllable of text." See Saadi Report at 37.

[8] According to Saadi, "[t]he vertical line marked on a stave to denote the point of metrical division is actually the bar but in modern usage has come to be called the bar line, while the space between such lines is the bar itself. Thus '3 beats to the bar'. In Amer. parlance, a bar is called a measure, and a bar means a bar line. 2 vertical lines close together are, in Eng., a double bar, not double bar line." Id. at 27.

[9] Saadi states that "arpeggiate" is a verb meaning "[m]usic play (a chord) as a series of ascending or descending notes." Id. at 26.

and the lead vocal of each song begins at verse 1, with a pick-up note[10] near the end of bar 18. Id. at ¶¶ 31–32. Saadi further states that the manner in which the guitars are performed and the vocals are sung is a common trait in both songs. Id. at ¶ 33. Saadi admits that there are certain differences in the songs' introductions, such as the number and pitches of pickup notes and phrasing of certain melodies. Id. ¶ 34. Saadi opines, however, that when looking at the general composition of the introductions of "Reasons" and "Burn," there are both substantial and striking similarities. Id. ¶¶ 30, 34.

Saadi further states that the overall structure of both songs is substantially similar, including the number of bars in the introduction, verses, choruses, and bridges. Id. ¶¶ 35–36. Saadi points out that the first hook is sung at the exact same measure in both songs. Id. ¶ 36. Saadi concedes that there is a slight variance in the structure of the songs due to the first chorus in "Reasons" lasting only 8 bars compared to the 16 bar initial chorus in "Burn." Id. Likewise, Saadi notes that the third verse in "Reasons" is replaced with the first bridge in "Burn." Id. Nevertheless, in Saadi's opinion, these differences do not detract from the similarity of the overall structure of "Reasons" and "Burn." Id.

Saadi also identifies substantial similarities in repeated melodic sequences and harmonic progressions in "Reasons" and "Burn." Id. ¶¶ 37–40. Saadi states that there is an occurrence in one of the harmonizing voices in "Reasons" where a particular melodic sequence is presented as part of the chorus. Id. ¶ 37. Saadi opines that there is a similar sequence in "Burn" that is instrumental rather than vocal. Id. ¶ 39. Saadi points to another melodic sequence in "Reasons," consisting of a sequence of pitches from a melody in the lead vocal, that is also repeated in "Burn." Id. ¶ 40. According to Saadi, the fact that these sequences appear in the hooks and choruses of both songs, "underlines their importance to the composition. . . ." Id. ¶ 41. Saadi also states that the harmonic

---

[10] Saadi defines "pick up notes" as "a series of introductory notes leading into the opening part of a tune." Id. at 42.

progressions in both "Reasons" and "Burn" are substantially similar.  Id. ¶ 42.  Although Saadi notes certain differences in the songs' chord progressions, he claims that many of the different chords in "Burn" are from the same family of chords used in "Reasons." Id. ¶ 43.  Therefore, according to Saadi, despite the appearance of differences, "the impact on the listener's ear may be more slight."  Id.

Saadi further asserts that the stylistic use of a melisma prior to the fade out in both songs contributes to their substantial similarity.  Id. ¶ 44.  According to Saadi, the fact that the melisma occur where they do, signaling the chorus section preceding the fade, is "highly unlikely . . . to be a coincidence."  Id. ¶ 45.

Finally, Saadi identifies "other notable similarities" between the two songs.  Id. ¶¶ 46–48.  First, Saadi opines that at bars 111 through 114, both "Reasons" and "Burn" are in the key of D-flat.  Id. ¶ 46.  Second, Saadi points out that both "Reasons" and "Burn" are styled in the contemporary R&B sound, making use of soul vocals with elements of hip hop production.  Id. ¶ 47.

Considering the foregoing similarities together, and the works as a whole, Saadi opines that "Burn" is strikingly similar to "Reasons."  Id. ¶ 49.

The Court finds that Saadi's expert testimony is sufficient to raise a genuine issue of material fact as to substantial and striking similarity.  As in Three Boys, Saadi has identified particular features of the works which, taken in combination, can support a finding of substantial similarity.  Three Boys, 212 F.3d at 485 (upholding jury verdict based upon a combination of five unprotectable elements).  Although Saadi's opinions are contradicted or challenged by defendants' expert, Dr. Ferrara, all plaintiff must do to defeat summary judgment is provide "indicia of a sufficient disagreement concerning the substantial similarity of the two works."  Swirsky, 376 F.3d at 846 (quoting Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1472 (9th Cir. 1992)).  Furthermore, the Court is largely unconvinced by defendants' criticisms of Saadi.

First, defendants argue that Saadi's testimony is not helpful because he failed to distinguish between ideas and expression.  Record Label Supp. Mem. at 2–3.  According

to defendants, Saadi confused the distinction between idea and expression with the copyright principle of fixation in tangible form, such that, in Saadi's view, anything recorded or written down must be expression.  Id.

The extrinsic test requires similarity in protected elements of a copyrighted work, and therefore, "it is essential to distinguish between the protected and unprotected material in a plaintiff's work."  Three Boys, 212 F.3d at 485; see also Idema, 162 F. Supp. 2d at 1178 (in performing the "analytic dissection," the court must "first separate unprotectable facts and ideas from potentially protectable expressions.") (internal quotation marks omitted).  In this case, it appears that Saadi specifically identified protected musical passages in each work, and did not confuse musical ideas with musical expression.  See Saadi Report at  ¶ 3 ("I have identified several musical elements in ["Burn"] that in my view are substantially similar to corresponding elements [in "Reasons."]) (emphasis supplied); id. ¶ 9 ("in conducting my dissection of the three works, and my analysis and comparison of them, the musical elements I considered first were melody/melodic patterns, harmony/harmonic sequence, rhythms, and lyrics."); see also Saadi Depo. at 31:1–15 (explaining that, in his view, the 18-bar introduction is an expression and "more than an idea.").  Defendants' citation to parts of Saadi's deposition where he equivocally suggests that certain portions of the compositions may be "concepts" or "ideas" is unavailing.  The Ninth Circuit has held that "a musicologist is not an expert on what the term 'idea' means under the copyright laws.  Labeling something as a 'musical idea' does not necessarily bear on whether it is also an 'idea' under the copyright laws and unprotectable for that reason."  Swirsky, 376 F.3d at 851.

Defendants' argument that Saadi only identifies commonplace and unprotectable ideas fails for a similar reason.  See Songwriters' Supp. Mem. at 7.  It is true that certain elements Saadi relies upon to support his opinion on substantial similarity may be unprotectable individually.  The Ninth Circuit has made clear, however, that the extrinsic test can be satisfied by showing copying of a "combination of unprotectible elements."  Three Boys, 212 F.3d at 485 (emphasis supplied); see also Swirsky 376 F.3d at 851–52

("Although it is true that a single musical note would be too small a unit to attract copyright protection (one would not want to give the first author a monopoly over the note of B-flat for example), an arrangement of a limited number of notes can garner copyright protection.").   Accordingly, the Court cannot hold as a matter of law that the similarities identified by Saadi are not protectable musical expressions.

Defendants further assert that Saadi ignores the differences between "Reasons" and "Burn."[11]   Record Label Supp. Mem. at 3–4.  The Ninth Circuit has held that "lists of similarities are inherently subjective and unreliable, especially where they emphasize random similarities scattered throughout the works."  Olson v. Nat'l Broad. Co., 855 F.2d 1446, 1450 (9th Cir. 1988).   Thus, a district court can properly discount an expert's testimony where he or she deemphasizes a work's many dissimilarities and instead emphasizes a few general similarities.  See, e.g., Idema, 162 F. Supp. 2d at 1180.  By the same token, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate."  Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936).  As Professor Nimmer explains, "[i]t is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown."  4 Nimmer on Copyright, § 13.03[B][1], at 13-67.

In this case, the Court finds that Saadi does not simply list random similarities scattered throughout the two songs.  Nor does he completely ignore the differences between "Reasons" and "Burn," as defendants suggest.  As discussed above, Saadi identifies certain differences between the songs, but ultimately concludes that those differences do not impact his ultimate conclusion on similarity.  See, e.g., Saadi Report ¶

---

[11] Defendants also point to a litany of so-called "concessions" from Saadi's deposition that, they argue, foreclose a finding of substantial similarity.  See Songwriters' Supp. Mem. at 3–6.  To the extent that Saadi's deposition testimony conflicts with his conclusions, such testimony may be a ripe topic for cross examination.  It does not, however, weigh strongly in favor of granting summary judgment on substantial similarity.

34; see also Swirsky, 376 F.3d at 846 (expert noted a number of differences between two songs' choruses, but ultimately concluded that the differences were not enough to differentiate the songs).  Furthermore, to the extent Saadi does not identify certain dissimilarities between the works, such a failure is not fatal to plaintiff's case because all that is required is that plaintiff show that "Burn" is similar to a substantial portion of protectable elements from "Reasons."  Swirsky, 376 F.3d at 849.  Most notably in this respect, Saadi opines that the two songs contain a substantially similar 18-bar introduction.  Saadi Report ¶¶ 30–34.[12]

Accordingly, the Court finds that there is a genuine issue of material fact as to whether "Burn" is substantially or strikingly similar to protectable elements in "Reasons."

### C.   Damages

Finally, defendants argue that because plaintiff owns only 13 percent of the "Reasons" copyright, they are entitled to partial summary judgment limiting plaintiff's potential recovery to a corresponding percentage of damages.  Mot. at 25.  As discussed in Part IV.A.2, however, there is a triable issue of fact as to plaintiff's ownership share in the "Reasons" copyright.  Accordingly, defendants are not entitled to partial summary judgment limiting plaintiff's recovery to 13 percent of damages.

///

///

## V.   CONCLUSION

In accordance with the foregoing, the Court hereby DENIES defendants' motion for summary judgment or, in the alternative, for partial summary judgment.

---

[12] Defendants further argue that Saadi mistakenly bases his opinion on an assumption of defendants' access to "Reasons."  Record Label Supp. Mem. at 5–6 (citing Saadi Depo. at 77:2–13, 83:11–21).  The Court has found, however, that there is a genuine issue of material fact as to whether defendants had access to "Reasons."

IT IS SO ORDERED.

Dated: August 19, 2011

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE